**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 1:21-cr-00186-CRC |
| | : | |
| DAVID ALAN BLAIR, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S AMENDED MOTION TO
DISMISS INDICTMENT**

The United States of America, by and through the United States Attorney for the District

of Columbia, hereby opposes defendant's amended motion to dismiss the indictment (ECF # 26),

which seeks to dismiss Counts One through Three of the Indictment and seeks a severance with

respect to Count Seven.

The defendant has been arraigned on the Indictment and has pled not guilty. On

November 10, 2021, subsequent to the filing of the defendant's amended motion, the grand jury

returned a Superseding Indictment against the defendant (ECF # 27). The Superseding

Indictment, as to which the defendant has yet to be arraigned, contains the same counts as the

original Indictment, in the same sequence, and merely makes technical changes to Counts Two

and Three. The government is treating the defendant's amended motion as seeking the same

relief with respect to the Superseding Indictment.

<u>Background</u>

The nine-count Superseding Indictment charges the defendant with multiple offenses

relating to the January 6, 2021, attack on the Capitol. During that incident hundreds of rioters

unlawfully entered the Capitol grounds and the Capitol building itself, seeking to stop Congress from certifying the results of the 2020 Electoral College vote for President and Vice President. In addition to unlawfully entering the grounds and the building, many of the rioters damaged government property and assaulted officers of the U.S. Capitol Police and the Metropolitan Police Department (MPD).  As a result of the attack, Congress suspended the certification proceedings at approximately 2:20 p.m. and did not resume the certification until approximately 8 p.m.

In the case of this defendant, he unlawfully entered the Capitol grounds on January 6, and, at approximately 5:47 p.m., on the West Terrace, attacked MPD Officer K.P., who was assisting the U.S. Capitol Police with trying to clear the Capitol grounds of rioters.  During the attack on the officer, the defendant, while wearing a mask, profanely taunted the officer and struck him with a wooden lacrosse stick, to the end of which the defendant had attached a short pole holding a small Confederate battle flag.  After being subdued by Officer K.P. and other law enforcement members the defendant was placed under arrest.  During a search incident to arrest law enforcement members recovered a knife, with a blade approximately 3 ½ inches long, from one of the defendant's pockets.

Count One charges the defendant with assaulting a person assisting U.S. government employees and officers, specifically, Officer K.P., with a dangerous weapon, that is, a flagpole, in violation of 18 U.S.C. § 111(a)(1) and (b).  Count Two charges him with obstructing, impeding and interfering with Officer K.P., or attempting to do so, during a civil disorder that adversely affected commerce and the conduct and performance of a federal function, in violation of 18 U.S.C. § 231(a)(1).  Count Three charges him with aiding and abetting an attempt to obstruct Congress's certification of the Electoral College vote, in violation of 18 U.S.C. § 2 and

1512(c)(2).  Count Four charges him with entering and remaining on restricted grounds of the Capitol, where the Vice President was temporarily visiting, while carrying and using a dangerous weapon (a flagpole), in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A).  Count Five charges him with engaging in disruptive and disorderly conduct on restricted grounds of the Capitol, where the Vice President was temporarily visiting, while carrying and using a dangerous weapon (a flagpole), in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A).  Count Six charges him with engaging in physical violence on restricted grounds of the Capitol, where the Vice President was temporarily visiting, while carrying and using a dangerous weapon (a flagpole), in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A).  Count Seven charges him with carrying a dangerous weapon, a knife with a blade longer than three inches, on the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(1)(A)(i).  Count Eight charges him with engaging in disruptive and disorderly conduct on the Capitol grounds, with the intent to disrupt a congressional proceeding, in violation of 40 U.S.C. § 5104(e)(2)(D).  And Count Nine charges him with engaging in physical violence on the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).

In his amended motion the defendant argues that, under rule 12(b)(1) of the Federal Rules of Criminal Procedure, Counts One through Three each fail to state an offense and must therefore be dismissed.  With respect to Count One, he argues that because the weapon, a flagpole, was actually a lacrosse stick, it cannot be a "deadly or dangerous weapon" for purposes of 18 U.S.C. § 111(b).  As to Count Two he argues there was no "civil disorder" taking place when and where he interfered with Officer K.P.  And as to Count Three he argues that the certification of the Electoral College vote is not an "official proceeding" within the meaning of 18 U.S.C. § 1512, and that the statute is also void for vagueness.  Finally, he argues that Count

Seven, in which he is charges with carrying a knife longer than three inches in length, should be severed for trial from the remaining counts to avoid unfair prejudice to him.[1]

Argument

1. <u>A Flagpole Can Be A Dangerous Weapon, For Purposes Of 18 U.S.C. § 111(b), Based On The Manner In Which The Defendant Used It.</u>

The  U.S. Court of Appeals for the D.C. Circuit has supplied a definition for the phrase "deadly or dangerous weapon" as it is used in § 111(b).   According to the court, "[f]or an object that is not inherently deadly [such as a gun], … the object must be capable of causing serious bodily injury or death to another person and the defendant must use it in that manner."  *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).  The defendant claims in his motion that because a lacrosse stick is used for purposes other than as a weapon, it cannot be a deadly or dangerous weapon for purposes of the statute, and then claims that based on the discovery the defense has received, there is no evidence in this case that the complainant, Officer K.P., was in fact injured or that the lacrosse stick was used in a manner likely to produce serious bodily injury.

There is no requirement, however, that a section 111(b) complainant suffer *any* injury at all for a defendant charged under the statute to be guilty of assault with a dangerous or deadly weapon.

Moreover, the defense is apparently relying on some very ambiguous police body-worn camera video recording, provided in discovery, to conclude that the defendant did not use the lacrosse stick—i.e., the flagpole, as charged in the Superseding Indictment—to strike Officer K.P. in the head or in some other fashion likely to cause serious injury.  As the Court will likely

---

[1]The defendant makes no argument against any of the remaining counts, i.e., Counts Four, Five, Six, Eight and Nine.

see at some point in this case, the recording, while clearly showing the defendant wielding the flagpole in close proximity to Officer K.P., as the two are facing each other, becomes distorted, shaky and difficult to follow moments later when the defendant and the officer come into physical contact and begin to grapple with each other.  This is not surprising given that the officer is wearing the camera on his chest.

Which plainly shows that the issue is a matter for the jury at trial, or at the very least for the Court to consider in a defense motion for a judgment of acquittal after the government has rested its case.  It is not appropriate for a defense motion brought under rule 12(b)(3)(B)(v), claiming that the charge is flawed because of a "failure to state an offense."  As the court held in *United States v. Safavian*, 429 F. Supp. 2d 156 (D.D.C. 2006), such a motion is limited to the "four corners of the indictment."  *Id.* at 159.  And as the Supreme Court has held:

> [A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.  It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.

United States v. Hamling, 418 U.S. 87, 117 (1974) (citation and internal quotation marks omitted).

The defendant's motion makes no direct attack on the language of Count One in the Superseding Indictment.  Accordingly, his claim that that count fails to state an offense necessarily fails.

2. Whether There Was A Civil Disorder Occurring At The Time The Defendant Interfered With Officer K.P. Is Not An Appropriate Subject For A Motion Alleging Failure To State An Offense.

5

For similar reasons, the defendant's highly fact-oriented claim that there was no civil disorder occurring when he attacked Officer K.P. is also not a proper issue for a rule 12(b)(3)(B)(v) motion.  In fact, the government intends to prove at trial that there was still a crowd of rioters in the immediate vicinity of the defendant when he attacked Officer K.P., and that that attack occurred as that officer, and others assisting him, were ordering the crowd to move back and off of the Capitol grounds.

3. <u>Congress's Certification Of The Electoral College Vote Is An "Official Proceeding" Under 18 U.S.C. § 1512(c).</u>

A. <u>Background</u>

The Constitution and federal statutory law require that both Houses of Congress meet to certify the results of the Electoral College vote.  Two separate provisions in the Constitution mandate that the Vice President while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted."  U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.  Under the Electoral Act of 1887, a Joint Session of the Senate and the House of Representatives must meet at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15.  Section 15 details the steps to be followed: the President of the Senate opens the votes, hands them to two tellers from each House, ensures the votes are properly counted, and then opens the floor for written objections, which must be signed "by at least one Senator and one Member of the House of Representatives."  *Id.*  The President of the Senate is empowered to "preserve order" during the Joint Session.  *Id.* § 18.  Upon a properly made objection, the Senate and House of Representatives withdraw to consider the objection; each Senator and Representative "may speak to such objection . . . five minutes, and not more than once."  *Id.* § 17.  The Electoral Act, which specifies where within the chamber Members of Congress are to

sit, requires that the Joint Session "not be dissolved until the count of electoral votes shall be completed and the result declared." *Id.* § 16.

The obstruction statute under which the defendant is charged prohibits corruptly obstructing, influencing, or impeding any official proceeding. *Id.* § 1512(c)(2). An official proceeding for purposes of § 1512(c)(2) is defined as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce[.]

*Id.* § 1515(a)(1) (emphasis added).

B.   Certification of the Electoral College vote is a proceeding before the Congress.

The certification of the Electoral College vote as set out in the Constitution and federal statute is a "proceeding before the Congress," 18 U.S.C. § 1515(a)(1)(B), and, therefore, an "official proceeding" for purposes of 18 U.S.C. § 1512(c)(2). That conclusion flows principally from the obstruction statute's plain text. Skipping past the text, the defendant argues that Congress's intent and other language in the obstruction statute import a "quasi-judicial" requirement into the term "official proceeding." That argument is incorrect, but even if it were, it would not disqualify the Electoral College vote certification.

Understanding what qualifies as an official proceeding "depends heavily on the meaning of the word 'proceeding'" because "official proceeding" is defined "somewhat circularly" as, among other things, a congressional "proceeding." *See United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013).   The certification of the Electoral College vote constitutes a "proceeding" under any interpretation of that term.  In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior." *Id.* (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com).  The defendant does not meaningfully contend that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, is not a proceeding—and indeed an official proceeding—under that broad definition.  And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.  Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."  18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly").

But even if the "legal—rather than the lay—understanding" of proceeding governs Section 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification qualifies.  This narrower definition includes the "business conducted by a court or other official body; a hearing."  Black's Law Dictionary, "proceeding" (11th ed. 2019).  Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing." *Ermoian*, 752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").

For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515 courts analyze the degree of formality involved in an investigation. *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added).

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *See Perez*, 575 F.3d at 169. Few events are as solemn and formal as a Joint Session of the Congress. That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute. Required by law to begin at 1 pm on the January 6 following a presidential election, the certification of the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body." *See* Black's Law Dictionary, *supra*. The Vice

9

President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.  3 U.S.C. § 15.  As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.  *Id.*  And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the "Hall."  *See id.* § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform").  The Electoral College vote certification, moreover, must terminate with a decision:  no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared."  *Id.*  In short, the certification of the Electoral College vote is a "proceeding before the Congress."  *See* 18 U.S.C. § 1515(a)(1)(B).

Indeed, other than a vague reference to "a congressional investigation," the defendant does not explain which congressional proceedings—except, perhaps, of impeachment—would fall within the ambit of his narrowed definition.  That crabbed approach fails to recognize that the certification of the Electoral College vote is an official proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it] but increase the chances of false and unjust outcomes."  *Sutherland*, 921 F.3d at 426.  Whatever the outer limits of a "proceeding before the Congress" for purposes of the obstruction statute, the Electoral College vote certification falls well within them.

The defendant's challenge fails even if he were correct—and he is not—that for a proceeding to constitute an "official proceeding" under the obstruction statute, that proceeding must be "quasi-judicial" or "quasi-adjudicative."   The certification of the Electoral College vote actually comprises features that resemble an adjudicative proceeding.  It involves the convening of a Joint Session of Congress, a deliberative body over which a government officer, the Vice President as President of the Senate, "presid[es]."  3 U.S.C. § 15.  That body convenes to render judgment on whether to certify the votes cast by Electors in the presidential election.  As in an adjudicative setting, parties may lodge objections to the certification, and if any such objection is lodged, each House must consider the objection and make a "decision" whether to overrule or sustain it.  *Id.*  And just as a jury is not (barring a mistrial) dismissed until it has a reached a verdict, the Joint Session cannot "be dissolved" until it has "declared" a "result."  *Id.* § 16.

4.   18 U.S.C. § 1512(c) Is Not Unconstitutionally Vague.

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV.  An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).  To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)).  To avoid arbitrary enforcement, the law must not "vest[] virtually

11

complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "'Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.'" *Bronstein*, 849 F.3d at 1107 (quoting *Rose v. Locke*, 423 U.S. 48, 50 (1975) (per curiam)). Rather, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *Williams*, 553 U.S. at 306; *see Smith v. Goguen*, 415 U.S. 566, 578 (1974). The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at 1107 (quoting *Roth v. United States*, 354 U.S. 476, 491 (1957)). A statute is instead vague where it fails to specify any "standard of conduct . . . at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). "As a general matter," however, a law is not constitutionally vague where it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603–04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).

The defendant fails to overcome the strong presumption that Section 1512(c)(2) passes constitutional muster. *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language."). Section 1512(c)(2) does not tie criminal culpability to "wholly subjective" terms that are bereft of "narrowing context" or "settled legal meanings," *Williams*, 553 U.S. at 306, nor does it require application of a legal standard to an "idealized ordinary case of the crime," *Johnson*, 576 U.S. at 604. Section 1512(c)(2)'s prohibition on "corruptly . . . obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempt to undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950

The defendant provides no support for his position. Nor could he. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). In this case, the defendant profanely taunted and attacked a police officer with a weapon, while seeking to prevent the Electoral College certification from resuming. Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, Section

1512(c)'s "corruptly" element provided ample notice to the defendant that *his conduct*, violently

attacking a police officer in order to prevent or stop a congressional proceeding, was criminal.

Similarly, the mere fact that a "proceeding," as discussed above, includes more than an

adjudicative-type proceeding does not render that term unconstitutionally vague.  The term is far

from wholly subjective and the defendant can hardly argue that he had no notice that a violent

attempt to interfere with *any* congressional proceeding fell within the ambit of Section

1512(c)(2).

> 5. <u>Count Seven Is Properly Joined With The Other Counts And Severance Is Not Required Because There Is No Serious Risk That A Joint Trial With The Other Counts Would Prevent The Jury From Making A Reliable Judgment About Guilt Or Innocence.</u>

Under rule 8(a) of the Federal Rules of Criminal Procedure, "[t]he indictment . . . may

charge a defendant in separate counts with 2 or more offenses if the offenses charged—whether

felonies or misdemeanors or both—are of the same or similar character, or are based on the same

act or transaction, or are connected with or constitute parts of a common scheme or plan."  Here,

the charge of unlawfully possessing the knife is part of the same act and transaction as the other

counts.  As described above, the defendant unlawfully possessed the knife on the Capitol

grounds.  At the same time, and in the same place,  he was engaging in disorderly and disruptive

conduct, and physical violence; he was assaulting and interfering with a law enforcement

member; and he was attempting to obstruct an official proceeding.

It is of no moment that the defendant never wielded or used the knife while committing

the other offenses.  After his arrest, he admitted he was carrying the knife in his backpack in case

he got "jump[ed]" by "Antifa."  Which is a clear acknowledgment that he carried the knife for

use as a weapon, as supposed to for some innocuous or peaceful purpose.  And it was a further

acknowledgment that he was willing to use that weapon against his political and ideological

enemies, which is consistent with his motive for committing the other acts of violence that day—

to stop the transfer of power to a candidate he did not support.  As the D.C. Circuit held in

*United States v. Gooch*, 665 F.2d 1318 (D.C. Cir.), *cert. denied*, 566 U.S. 967 (2012), "[t]he

government need only allege facts to sustain joinder, not prove them."  *Id.* at 1325 (internal

quotation marks omitted).  This the government has done.

Of course even properly joined counts are subject to rule 14(a) of the Federal Rules of

Criminal Procedure, which provides that "[i]f the joinder of offenses . . . in an indictment . . . , or

a consolidation for trial appears to prejudice a defendant, the court may order separate trials of

counts . . . or provide any other relief that justice requires."  In his motion the defendant argues,

in conclusory fashion, that evidence of the fact that the defendant was carrying a knife will cause

the jury to infer he has a criminal disposition.

But severance is only proper under rule 14 if there is a "serious risk" of prejudice, or

more specifically, of the jury being prevented from making a reliable judgment as to guilt or

innocence.  *Id.* at 1326.  This the defense cannot show.  A four-to-five-inch-long knife is hardly

the type of weapon that would inflame a jury's passions against the defendant.

<u>Conclusion</u>

The defendant's amended motion should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
ACTING UNITED STATES ATTORNEY

/s/*Michael C. Liebman*
Michael C. Liebman
Assistant United States Attorney
D.C. Bar No. 479562
555 4th Street, N.W., room 9106
Washington, D.C.  20530