**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **No. 1:21-cr-000186-CRC** |
| | **:** | |
| **DAVID A. BLAIR,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**
**EVIDENCE**

The United States of America, by and through the United States Attorney for the District of Columbia, hereby opposes defendant David A. Blair's motion (ECF no. 41) to suppress a knife recovered from a backpack in Blair's possession during a search incident to his arrest. Law enforcement had probable cause to arrest Blair for entering a restricted area on U.S. Capitol grounds, remaining there in defiance of a police order to vacate it, assaulting a police officer, and engaging in other unlawful conduct. Law enforcement then permissibly searched the backpack after Blair's arrest and discovered the knife.

Background

Defendant Blair is one of many individuals who participated in the January 6, 2021 attack on the Capitol. The indictment charges him with the following counts:

- (1) assaulting with a dangerous weapon Metropolitan Police Department (MPD) Officer K.P., who was assisting a federal officer, in violation of 18 U.S.C. § 111(a)(1) and (b);

- (2) interfering with an officer during a civil disturbance, in violation of 18 U.S.C. § 231(a)(3);

- (3) obstructing and attempting to obstruct an official proceeding before Congress, in violation of 18 U.S.C. § 1512(c)(2);

- (4) entering and remaining on restricted grounds of the Capitol while carrying a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- (5) engaging in disorderly conduct on the Capitol grounds, while carrying a deadly weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- (6) engaging in physical violence on the Capitol grounds, while carrying a deadly weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- (7) carrying a dangerous weapon on the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(1)(A)(i);

- (8) engaging in disorderly conduct on the Capitol grounds with the intent to impede a congressional proceeding, in violation of 40 U.S.C. § 5104(e)(2)(D); and

- (9) engaging in physical violence on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).

The knife recovered from Blair's backpack is the basis for the dangerous-weapon charge in Count Seven.[1]

The Capitol building and the Capitol grounds were closed to the public on January 6, 2021. This includes the West Lawn where Blair violently assaulted Officer K.P. The closure—which the Capitol Police Board announced in August 2020—spanned September 7, 2020 through February 28, 2021, to allow for the construction and later removal of the presidential inauguration platform.[2] *See* Capitol Police Board Order 20.14 (attached as Exhibit). The Board's order authorized the western segment of the West Lawn to remain open as a "demonstration area" until January 6, 2021. *Id.* § 2(e).

This map displays the area surrounding the Capitol that was blocked off on January 6, 2021, with a blue triangle indicating the approximate location where Blair assaulted Officer K.P.

---

[1] The weapon alleged in Counts One, Four, Five and Six is a flagpole that Blair possessed and used to assault the MPD Officer.

[2] The Capitol Police Board consists of the Sergeant at Arms of the House of Representatives, the Sergeant at Arms and Doorkeeper of the Senate, the Chief of the Capitol Police, and the Architect of the Capitol. The Board oversees and supports the U.S. Capitol Police and coordinates with Congress. *See* 2 U.S.C. § 1901a(a)(1), (2).



The U.S. Capitol Police had placed fencing and square-shaped signage restricting public access to this area.  Surveillance video on January 6, 2021 shows the area near the Peace Circle (indicated on the map above with a white arrow) at 12:20 p.m. on January 6, 2021:



3

At 12:55 p.m., attackers breached the fenced perimeter near the Peace Circle.  About 90 minutes later, attackers breached the Capitol building, assaulted officers, broke doorways, and smashed windows.  Law enforcement eventually cleared the Capitol building at 5:40 p.m. and then proceeded to the restricted area on the Capitol grounds, including the West Lawn, where Blair and other individuals had assembled.

At 5:44 p.m., uniformed MPD officers walked westward on the West Lawn towards an assembled group.  They repeatedly and loudly instructed the group to "move back."  Each officer held their baton laterally in front of them, thrusting it forward and back as they walked.  Body-worn-camera video recorded Blair walking back and forth between the line of officers and the assembled group.  He wore a skull-themed face mask, carried a backpack, and held a pole adorned with a Confederate battle flag.  Blair yelled to the assembled group, "Quit backing up!" and "We're Americans!"  A few moments later, Blair moved toward Officer K.P., who thrusted his baton forward and made contact with Blair's shoulder.



Blair turned toward Officer K.P., squared up, and stated:  "What's up motherfucker, what's up, what's up bitch?"



One second later, Blair raised the flagpole and pushed it into Officer K.P.'s chest:



A struggle ensued, officers subdued Blair, and handcuffed him at 5:48 p.m.  At the time,

Blair had a black-cloth bag with thick yellow drawstrings attached to his back.



Officers did not immediately remove the backpack.  They instead led Blair from the West Lawn and to a secure area of the Capitol building.  At 6:20 p.m., officers searched Blair's person and the backpack, which was still hanging from his wrists.  It contained a knife.

Argument

Blair contends that his arrest violated his First Amendment rights of "expression and assembly"[3] (Deft. Mot. at 2) and that officers unlawfully searched his backpack after his arrest. Both claims lack merit.

I.   <u>Officers lawfully arrested Blair on the West Lawn.</u>

     A.   <u>Officers had probable cause to arrest Blair under the Fourth Amendment[4] based on observed violations of federal law.</u>

---

[3] "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble."  U.S. Const. amend. I.

[4] "The right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or thigs to be seized."  U.S. Const. amend. IV.

6

"A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause."  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).  The existence of probable cause, in turn, "depends on the totality of the circumstances."  *Id*. at 371.  The officer must have "a reasonable ground for belief of guilt … with respect to the person to be … seized."  *Id*. (internal quotation marks and citation omitted).

That standard is plainly satisfied here.  On January 6, 2021, officers encountered Blair on the West Lawn of the U.S. Capitol grounds—an area that had been closed to the public by order of the Capitol Police Board.  Blair refused to comply with police orders directing the assembled individuals to "move back"—*i.e.*, off the West Lawn.  At this point, officers had probable cause to believe that Blair had violated federal law by entering or remaining in a restricted area of the U.S. Capitol grounds.  Blair's subsequent attack on Officer K.P, where he used a flagpole to strike the officer in the chest, supplied further probable cause to believe Blair had committed an assault.  The Fourth Amendment accordingly authorized Blair's arrest.

      B.      <u>Blair's objections under the First Amendment do not bear on this inquiry.</u>

Blair does not address the Fourth Amendment's probable-cause standard or deny that officers had reasonable ground for believing he had committed a criminal offense on January 6, 2021.  Blair instead argues that the government (through the Capitol Police Board) violated the First Amendment when it closed the West Lawn to the public that day and when law enforcement sought to exclude him from the area.  This contention lacks merit.

      1.      "When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested."  *Redd v. City of Enterprise*, 140 F.3d 1378, 1383 (11th

Cir. 1998).  Courts have long "disagree[d]" with the contention that the Fourth Amendment's

standards for searches and arrests change when a "criminal investigation … interferes with …

First Amendment interests."  *United States v. Rubio*, 727 F.2d 786, 791 (9th Cir. 1983); *see also*

*Zurcher v. Stanford Daily*, 436 U.S. 547, 565 (1978) (holding that the Fourth Amendment

"afford[s] sufficient protection against the harms that are assertedly threatened by warrants for

searching newspaper offices"); *Nieves v. Bartlett*, 139 S. Ct. 1715, 1724 (2019) ("The plaintiff

pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the

arrest.").  That principle resolves this aspect of the motion.  Law enforcement had probable cause

to believe that Blair had committed various criminal offenses on the West Lawn.  The Fourth

Amendment accordingly authorized Blair's arrest.

Of course, Blair may raise a constitutional challenge to his prosecution--as other January

6 defendants have done.  But the validity of his arrest turns on the Fourth Amendment's

probable-cause standard, which was satisfied here.

2.      Even if the Court considered Blair's First Amendment claim, he would not be

entitled to any relief.

The West Lawn of the U.S. Capitol qualifies as a public forum for purposes of First

Amendment analysis.  *See Lederman v. United States*, 291 F.3d 36, 41-42 (2002).  The

government, however, retains discretion to adopt regulations over a public forum that "are

content-neutral, are narrowly tailored to serve a significant government interest, and leave open

ample alternative channels of communication."  *United States v. Grace*, 461 U.S. 171, 177

(1983) (citation omitted).  In such circumstances, the restriction "need not be the least restrictive

or least intrusive means" of serving the government's interest.  *Ward v. Rock Against Racism*,

491 U.S. 781, 798 (1989).  "The requirement of narrowly tailoring is satisfied 'so long as the . . .

regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* (citation omitted).

As discussed above, the Capitol Police Board had closed the West Lawn to the public on January 6, 2021.  This was done to facilitate the ongoing construction of the Inauguration platform and to secure the U.S. Capitol complex—which hosted the joint congressional session to certify the results of the Presidential Election on January 6, and which would host the presidential inauguration two weeks later.

This closure passes constitutional scrutiny.  First, it was content neutral.  The Capitol Police Board closed the West Lawn to all members of the public on January 6, 2021.  Moreover, the closure served a significant government interest.  It secured the U.S. Capitol grounds from possible intruders and security threats in advance of the Joint Session of Congress (where the 2020 presidential election would be certified) and the presidential inauguration (where the transition executive branch powers would occur).  Finally, Blair had ample alternative channels of communication.  Notably, other individuals who sought to protest the Electoral College certification proceeding had lawfully assembled on the White House Ellipse earlier that day and were present at various locations along the National Mall.  Blair's First Amendment claim accordingly fails.

Neither of the cases relied upon by Blair, *Abney v. United States*, 616 A.2d 856 (D.C. 1992), and *Wheelock v. United States*, 552 A.2d 503 (D.C. 1988), undermine this conclusion.  In *Abney* the D.C. Court of Appeals rejected a First Amendment challenge to the closure of steps surrounding the Capitol, which the Capitol Police Board imposed as a security measure before the Persian Gulf War.  616 A.2d at 857-62.  The court refused to invalidate the restriction even though the Board "could have developed an alternative measure imposing the restriction on

fewer individuals." *Id.* at 859.  *Abney* thus supports the Capitol Police Board's decision to close the West Lawn on January 6.

In *Wheelock* the D.C. Court of Appeals held that the U.S. Capitol Police's early closure of the Capitol Rotunda and resulting arrest of demonstrators who had been sitting and praying in that location violated the First Amendment.  *See* 552 A.2d at 509 ("[T]he closure order was tailor-made for the demonstrators and it served as the basis for their arrests.").  In reaching this conclusion, the court found no "evidence that the presence of the appellants and the group with which they associated disrupted either the legislating or tourism activities of the Capitol Rotunda." *Id.* at 507.  Rather, it held that "the early closing order was precisely the kind of *ad hoc* exercise of unbridled discretion that is constitutionally prohibited." *Id.* at 510.

Contrast *Wheelock* with the facts of this case.  The Capitol Police Board provided the public with ample advance notice that the West Lawn would be closed on January 6, 2021.  This closure furthered the government's "indisputably legitimate interest in regulating the Capitol building to ensure the safety of legislators, employees, and visitors," *id.* at 507, participating in the Electoral College certification and, later, the Presidential Inauguration.  And unlike in *Wheelock*, *id.* at 508, law enforcement afforded Blair and others gathered on the West Lawn an opportunity to leave the area before they faced arrest.

C.  Municipal regulations governing expressive activity also do not bear on the Fourth Amendment's probable-cause inquiry.

Blair separately contends that law-enforcement officers violated the First Amendment Assemblies Act of 2004 ("FAAA"), D.C. Code §§ 5-331.01 - 5-331.17, in failing to issue audible and understandable orders to disperse before they arrested him.  This claim also lacks merit.

1.      The alleged violation of a D.C. statute does not give rise to a suppression remedy under the Fourth Amendment.

In *Virginia v. Moore*, 553 U.S. 164 (2008), the Supreme Court held that the Fourth Amendment is satisfied when objective justifications exist for a law-enforcement action , regardless of whether that action violates state law.  *Moore* upheld as "constitutionally reasonable" the arrest of a motorist whom police had probable cause to believe had violated Virginia law, even though state law itself would have authorized only a citation rather than an arrest.  *Id*. at 171.  The Court concluded that, because the arrest was "reasonable," it was permissible under the Constitution, and "state restrictions d[id] not alter the" calculus.  *Id*. at 176; *see id*. at 172 ("We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule.").

Any allegation that MPD officers violated the D.C. Code is accordingly irrelevant to the question whether their arrest of Blair was valid under Fourth Amendment.  *See Amobi v. D.C. Dept. of Corr.*, 410 U.S. App. D.C. 338, 347, 755 F.3d 980, 989 (2014) ("The Supreme Court has made clear that the 'Constitution's protections concerning search and seizure' do not vary with state arrest law."); *United States v. Johnson*, 557 F. Supp. 2d 154, 157-58 (D.D.C. 2008) (no violation of the Fourth Amendment where police, in violation of D.C. Code, failed to timely file a return of a search warrant with the D.C. Superior Court).[5]

2.      In any event, the FAAA does not, by its own terms, apply in this case.  It states that the MPD must "recognize and implement the District policy on First Amendment assemblies established in [D.C. Code] § 5-331.03 when enforcing any restrictions on First Amendment assemblies held on District streets, sidewalks, or other public ways, or in District parks."  D.C.

---

[5]For similar reasons, Blair's contention (Deft's Mot. at 3) that law enforcement violated a MPD general order does not warrant suppression.

Code § 5-331.04(a).  The West Lawn of the Capitol is not a "District street," a District "sidewalk," a "public way" or a "District park."  It is instead part of "the United States Capitol Building and Grounds."  2 U.S.C. § 1961(c).

But even if the Court examined MPD officers' compliance with the regulation, it would find no violation.  As relevant here, the regulation states that, "[i]f and when the MPD determines that a First Amendment assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly audible and understandable order to disperse using an amplification system or device, and shall provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal."  D.C. Code § 5-331.07.  It further provides, "[e]xcept where there is imminent danger of personal injury or significant damage to property, the MPD shall issue multiple dispersal orders and, if appropriate, shall issue the orders from multiple locations."  *Id.*

MPD officers complied with this directive.  Beginning at 2:00 p.m. on January 6, 2021, through a speaker on the West Terrace pointed toward the West Lawn, MPD broadcast a recorded message instructing:  "Pursuant to D.C. official code … all people must leave the area immediately.  Failure to comply with this order may subject you to arrest."  The message was broadcast regularly until the officers in that location were overrun.

At 5:44 p.m., when MPD officers moved in a line down the West Lawn, they loudly and repeatedly instructed the assembled crowed to "move back."  Individuals near Blair complied with this command and moved westward, eventually reaching the sidewalk along First Street. The record confirms that Blair heard this order because he yelled to the assembled group, "Quit backing up!" and "We're Americans!"  In his motion (Deft.'s Mot. at 2) he also admits to

hearing the line of MPD police officers chatting "move back, move back"--precisely the type of warning that the FAAA contemplates.

      C.    <u>Blair's cursory excessive-force allegation is baseless</u>.

      Blair briefly contends (Deft.'s Mot. at 3) that Officer K.P. used a "legally unjustified" amount of force against him in the initial encounter.  This allegation is factually incorrect and legally immaterial to this suppression motion

      Body-camera footage (which the government will lodge with the Court upon request) shows that Blair moved toward Officer K.P., leading with his left shoulder.  Officer K.P. then pushed Blair, with his baton, in Blair's shoulder area.  This contact moved Blair back a few feet, but did not knock him down.  Blair then called Officer K.P. a "bitch," raised his flagpole, and shoved it toward the officer's chest.

      Officer K.P.'s decision to push Blair back with his baton constituted a "reasonable[] display] of force based on the facts and circumstances of the particular case." *Oberwetter v. Hilliard*, 395 U.S. App. D.C. 52, 62, 639 F.3d 545, 555 (2011) (internal quotation marks, brackets and citation omitted).  Law enforcement had directed the crowd to "move back"; Blair did the opposite, approached the line of officers, and moved toward Officer K.P.  At this moment, Officer K.P. lacked knowledge as to whether Blair was armed with a weapon (other than the flagpole) or otherwise intended to harm the officers.  The decision to push Blair back with his baton reflected a reasonable use of force under the circumstances and, accordingly, comported with the Fourth Amendment.

      These allegations also do not, as a legal matter, support Blair's request for suppression. As explained above, officers had probable cause to believe that Blair had committed various crimes on the West Lawn.  Whether Officer K.P.'s initial contact with Blair's shoulder was

reasonable does not bear on the probable-cause calculus or the legality of Blair's subsequent arrest. *See United States v. Weaver*, 420 U.S. App. D.C. 254, 270, 808 F.3d 26, 42 (2015) (courts "consider causation"--whether the officers "obtain[ed] evidence that they are not authorized to see"--in assessing whether to apply exclusionary rule to a Fourth Amendment violation).

II.      Law enforcement validly searched Blair's backpack incident to his arrest.

Law enforcement may conduct a warrantless search of "the person" of an arrestee and "the area within the arrestee's immediate control" in order to remove any weapons and to prevent the destruction of evidence. *Chimel v. California*, 395 U.S. 752, 762-63 (1969). "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found." *United States v. Robinson*, 414 U.S. 214, 235 (1973). "Accordingly, even though the reasons for conducting a search incident to arrest, namely, to disarm and to discover evidence, may be stronger in some situations than in others, the Government is not obliged to justify each such search in the particular context in which it occurs." *United States v. Abdul-Saboor*, 318 U.S. App. D.C. 98, 101, 85 F.3d 664, 667 (1996).

In this case, MPD officers arrested Blair on the West Lawn, moved him to a secure location with the Capitol building, and conducted a search of the backpack still attached to his person. That search uncovered a knife.

Blair contends (Deft.'s Mot. at 4) that this was not a lawful search incident to arrest because he "was in handcuffs and in the custody of three officers." This contention is meritless. As multiple courts have recognized, "handcuffs are not fail-safe and they do not instantly and

completely eliminate all risks that the suspect will flee or do the officers harm." *E.g., United States v. Ferebee*, 957 F.3d 406, 419 (4th Cir. 2020) (citing cases; internal quotation and alteration marks and citation omitted); *see also United States v. Perdoma*, 621 F.3d 745, 753 (8th Cir. 2010) (noting "our repeated recognition in the non-vehicle search-incident-to-arrest context that it may be possible for an arrestee restrained in a room to reach items in that room"). For that reason, the D.C. Circuit and other appellate courts have rejected Fourth Amendment challenges to searches incident to arrest where the defendant had been handcuffed and multiple officers were present at the scene. *See, e.g.*, *United States v. Cook*, 808 F.3d 1195, 1197, 1199-1200 (9th Cir. 2015) (valid search with "six law enforcement agents at the scene" and where defendant was "face down on the ground with his hands cuffed behind his back"); *United States v. Shakir*, 616 F.3d 315, 320-21 (3d Cir. 2010) (same where defendant was handcuffed, two officers held his arms, and a third officer bent down and searched the bag); *Abdul-Saboor*, 318 U.S. App. D.C. at 103, 85 F.3d at 669 (permissible search of bedroom by two deputy marshals after defendant "was handcuffed and seated in a chair . . . about four feet from the bedroom door"); *United States v. Nohara*, 3 F.3d 1239, 1243 (9th Cir. 1993) (upholding search of black bag by DEA agents several minutes after handcuffing defendant).

Blair provides no justification for a different conclusion here, especially since his contentions (Deft.'s Mot. at 4) that "the bag had already been removed" and was "not within his immediate control" when the knife was recovered are incorrect. The video evidence shows that when he was first arrested and handcuffed, the backpack slid down Blair's back but remained attached to him because the drawstrings wrapped around his wrists. When officers moved Blair to a secure location, the top of the backpack was just a few inches below his hands. The top was not secured by a lock or a zipper; it was instead cinched shut by straps that could have easily

been loosened.  The backpack was still in that position the moment the knife was recovered, as the still image below indicates.



The safety concerns animating the search-incident-to-arrest doctrine were accordingly present, particularly given the antipathy that Blair had just demonstrated to the officers.  Their search of the backpack, therefore, was a lawful search incident to Blair's arrest.

Conclusion

The motion to suppress should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

by:     /s/*Michael C. Liebman*
        Michael C. Liebman
        Assistant United States Attorney
        D.C. Bar no. 479562
        555 4th Street, N.W., room 9106
        Washington, D.C.  20001
        (202) 252-7243
        (202) 353-9415 (fax)
        michael.liebman@usdoj.gov