**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **CASE NO. 21-cr-186 (CRC)** |
| **v.** | **:** | |
| | **:** | |
| **DAVID ALLEN BLAIR,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO TRANSFER VENUE**

Defendant David Allen Blair, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to another unspecified district. The defendant fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

**BACKGROUND**

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election. While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building. As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

The defendant unlawfully entered the Capitol grounds on January 6, and, at approximately 5:47 p.m., on the West Plaza, attacked MPD Officer K.P., who was assisting the U.S. Capitol Police with trying to clear the Capitol grounds of rioters. During the attack on the officer, the

1

defendant, while wearing a mask, profanely taunted the officer and struck him with a wooden lacrosse stick, to which the defendant had attached a pole holding a Confederate battle flag. After being subdued by Officer K.P. and other law enforcement officers, the defendant was placed under arrest. During a search incident to arrest, law enforcement members recovered a knife with a blade approximately 3 ½ inches long from one of the defendant's pockets.

For his conduct during the attack, he has been charged in a nine-count superseding indictment with the following offenses:

- (1) assaulting with a dangerous weapon Metropolitan Police Department (MPD) Officer K.P., who was assisting a federal officer, in violation of 18 U.S.C. § 111(a)(1) and (b);

- (2) interfering with an officer during a civil disturbance, in violation of 18 U.S.C. § 231(a)(3);

- (3) obstructing and attempting to obstruct an official proceeding before Congress, in violation of 18 U.S.C. § 1512(c)(2);

- (4) entering and remaining on restricted grounds of the Capitol while carrying a dangerous weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A);

- (5) engaging in disorderly conduct on the Capitol grounds, while carrying a deadly weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A);

- (6) engaging in physical violence on the Capitol grounds, while carrying a deadly weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A);

- (7) carrying a dangerous weapon on the Capitol grounds, in violation of 40 U.S.C. § 5104(e)(1)(A)(i);

- (8) engaging in disorderly conduct on the Capitol grounds with the intent to impede a congressional proceeding, in violation of 40 U.S.C. § 5104(e)(2)(D); and

- (9) engaging in physical violence on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).

Doc. 27.

The defendant now moves for a change of venue. Doc. 42. He contends that prejudice should be presumed in this district exclusively based on (1) the results of a survey conducted by

Select Litigation, and (2) the results of a media analysis conducted by Select Litigation.  The

defendant's arguments are without merit, and the motion should be denied.

## ARGUMENT

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where

the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment

similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the

crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard

against the unfairness and hardship involved when an accused is prosecuted in a remote place."

*United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally

required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United

States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district

if "so great a prejudice against the defendant exists in the transferring district that the defendant

cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify

unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best

course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain

whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States

v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot

be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d

31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  And, after voir dire, "it may be found that, despite

earlier prognostications, removal of the trial is unnecessary."  *Jones v. Gasch*, 404 F.2d 1231, 1238

(D.C. Cir. 1967).

I.      **The Select Litigation Poll Does Not Support a Presumption of Prejudice.**

The defendant primarily relies on a poll conducted by Select Litigation, a private litigation

consulting firm, at the request of the Federal Public Defender for the District of Columbia.  Doc.

42 at 2.  Select Litigation conducted a telephone poll of potential jurors in the District of Columbia

and in the Atlanta Division of the Northern District of Georgia and contracted with a media

research firm to analyze news media coverage of January 6 in both of those jurisdictions.

A.      **Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire.**

The defendant argues that this Court should find a presumption of prejudice based on the

results of a poll of prospective jurors.  But "courts have commonly rejected such polls as

unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."  *United

States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the

Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity

"undercuts" the "argument that poll percentages . . . decide the question of a presumption of

prejudice."  *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*,

500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . .

primary reliance on the judgment of the trial court makes good sense").

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of

a pre-voir dire survey.  *Haldeman*, 559 F.2d at 64.  In *Haldeman*, seven former Nixon

administration officials (including the former Attorney General of the United States) were

prosecuted for their role in the Watergate scandal.  *Id.* at 51.  According to a poll commissioned

by the defense in that case, 93% of the Washington, D.C. population knew of the charges against

the defendants and 61% had formed the opinion that they were guilty.  *Id.* at 144, 178 n.2

(MacKinnon, J., concurring in part and dissenting in part).  Recognizing that the case had produced

a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64.  The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel."  *Id.* at 64 n.43.

Other circuits have likewise rejected attempts to elevate polling results over voir dire.  In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were.  *Campa*, 459 F.3d at 1157 (Birch, J., dissenting).  The en banc Eleventh Circuit affirmed the denial of a motion for change of venue, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt.  *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19.  Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions."  *Rodriguez*, 581 F.3d at 786.  And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since

the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire rather that public-opinion polls when assessing whether prejudice should be presumed.  First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses.  *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions).  Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395.  Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it.  But that is not the ultimate question when picking a jury.  A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.* at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And the defendant

has not offered any reason to depart from that usual practice here.  Thus, this Court need not give

substantial weight to the polling when considering whether to presume prejudice.  But, as

explained below, the Select Litigation poll does not support a presumption of prejudice in any

event.

        **B.**         **The Select Litigation poll does not demonstrate pervasive prejudice in the District of Columbia.**

Contrary to the defendant's contention, the Select Litigation poll does not support a

presumption of prejudice in this District.  For one thing, the poll indicates that levels of media

exposure to the events of January 6 are not significantly different in Atlanta than in Washington,

D.C.  The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed

only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin

of error.  Doc. 42 at 5-6, 18.  The number of respondents who had seen "[s]ome" coverage was

exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of

coverage was not significantly different (28% in D.C. versus 20% in Atlanta).  *Id.* at 18.  The total

percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news

coverage was 86% in Washington, D.C. and 75% in Atlanta.  *Id.* at 18.  This relatively small

difference does not suggest that news coverage has made it impossible to pick an impartial jury in

Washington, D.C.

The defendant points out (Doc. 42 at 2) that, according to the Select Litigation poll, 84%

of D.C. respondents had an "unfavorable" view of "people arrested for participating in the events

at the U.S. Capitol on January 6."  Doc. 42 at 18.  Although that is higher than the 54% of Atlantans

with unfavorable views, it is quite similar to the results of a nationwide CBS poll, which found

that 83% of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken

by the people who forced their way into the U.S. Capitol on January 6."  *See* CBS News Poll,

December 27-30, 2021, Question 2, https://drive.google.com/file/d/ 1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view.  The defendant has not asked to be tried in Atlanta and has not provided any information about the views in any alternative venue.  And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this jurisdiction.

The defendant also points out (Doc. 42 at 2) that 71% of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of the charges brought against them.  *See* Doc. 42 at 18.  The survey failed, however, to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area.  *See* American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf ("Respondents must be made aware that they can say they do not know or have no opinion.").  The survey instead gave respondents a binary choice between "guilty or not guilty."  Doc. 41 at 18. Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused."  *Id.*  This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice. In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here.  *See Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both

"No" (*i.e.* had not formed an opinion) and "Don't Know/No Opinion." *Id.* at 178 n.2.  The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know." *Id.*  Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty." *Id.*  Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty."  Doc. 42 at 18 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty."  Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty."  Doc. 42 at 18.  In response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused." *Id.*  Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

The defendant also points out (Doc. 42 at 3) that 62% of D.C. respondents (compared to 48% of Atlanta respondents) would describe "most of the people who were arrested for their involvement in the events on January 6th" as "criminals."  Doc. 42 at 18 (Question 10).  The answers to this question likely reflect the commonly held view that most people arrested for crimes

are in fact guilty of those crimes.  But the fact that 62% of D.C. respondents expressed this off-

the-cuff view about "most" of the 700-plus January 6th arrestees does not demonstrate that all of

those respondents would be unable to impartially find the facts in a specific case after being

properly instructed by the Court.  Moreover, the question demonstrates that fully 28% of D.C.

respondents would *not* describe those arrestees as criminals, and 9% were unsure or refused to

answer.  Doc. 42 at 18.  And the 14% difference between D.C. and Atlanta—which could easily

be explained by demographic differences such as age and education levels (*see* Doc. 42 at 19)—

would not justify the conclusion that this is an "extreme case" in which a change of venue is

required.  *Skilling*, 561 U.S. at 381.

Nor should prejudice be presumed because a substantial numbers of respondents "would"

describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the

election and keep Donald Trump in power" (85%), engaging in "[i]nsurrection" (76%), or "[t]rying

to overthrow the U.S. government" (72%).  Doc. 42 at 19.  For one thing, the poll did not provide

an "undecided" option but asked only whether respondents "would" or "would not" use those

descriptions.  *Id.*  For another, the question did not define the offenses of "insurrection" or

advocating the overthrow of government, *see* 18 U.S.C. §§ 2383, 2385, offenses with which no

defendant has been charged in connection with January 6.  And, most importantly, the poll did not

answer the key question: whether a sufficient number of prospective jurors can "lay aside [their]

impression[s] or opinion[s] and render a verdict based on the evidence presented in court."  *Irvin*,

366 U.S. at 723; *see Patton v. Yount*, 467 U.S. 1025, 1029 (1984) (no presumption of prejudice

where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that

"they would carry an opinion into the jury box").  In short, the Select Litigation poll does not come

close to demonstrating that "12 impartial individuals could not be empaneled" in Washington,

D.C.  *Skilling*, 561 U.S. at 382.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases.  But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses.  As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required.  *Haldeman*, 559 F.2d at 62.

## II.    The Select Litigation Media Analysis Does Not Support a Presumption of Prejudice.

The defendant also incorrectly contends that the media analysis conducted by Select Litigation supports a presumption of prejudice.  Doc. 42 at 3.  The defendant relies in part on Select Litigation's conclusion that "the number of hits from internet sites based in the District of Columbia area was four times higher than the comparable number of hits from sites based in the Atlanta area."  Doc. 42 at 3, 13.  But the analysis includes no information about where these hits came from.  Many of the hits on D.C.-based news sources likely came from readers outside the District itself, such as readers in the Northern Virginia and Maryland suburbs or readers from other parts of the country who were directed to D.C.-based news reporting on social media.  A reader in California, for example, would be far more likely to read about January 6 on the Washington Post than on the Atlanta Journal-Constitution.  Without additional information, this analysis of Internet hits is essentially meaningless.

The defendant also cites Select Litigation's analysis that concludes that coverage of local programming of network television affiliates had 7,300 hits in D.C. compared with 4,005 hits in Atlanta.  Doc. 42 at 3, 14.  But this fails to support a presumption of prejudice because mere

exposure to pretrial publicity does not disqualify a potential juror.  "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*."  *Skilling*, 561 U.S. at 381.  The Supreme Court has found no presumption of prejudice even when 98% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box."  *Patton*, 467 U.S. at 1029.   The mere fact that Washington, D.C. news outlets have run more stories about January 6 (and received more hits) than have Atlanta outlets does not suggest that an impartial jury cannot be selected in Washington D.C.

"The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity."  *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").   Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits."  *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878).  Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice.  *Irvin*, 366 U.S. at 723.  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Id.*

The Select Litigation analysis is also unhelpful because it considered only the coverage of January 6 in general, as opposed to the coverage of David Allen Blair.  Blair is one of more than 770 defendants charged in connection with January 6, and only a fraction of the media coverage has even mentioned him.  Indeed, the coverage of Blair is less significant than in *Skilling*, where

the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name." *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

*/s/ Alison B. Prout*
Alison B. Prout
Assistant United States Attorney
Georgia Bar No. 141666
75 Ted Turner Drive, SW
Atlanta, Georgia 30303
(404) 581-6000
alison.prout@usdoj.gov