**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **no. 1:21-cr-00350-PLF** |
| **DAVID ALAN BLAIR,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum.   For the reasons set forth herein, the government requests that the Court sentence defendant David Alan Blair to eight months of imprisonment, which is the low end of the applicable Sentencing Guidelines range, followed by three years of supervised release; and that the Court order the defendant to pay $2000 in restitution and the mandatory $100 special assessment.

## I.     INTRODUCTION

The defendant participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars in losses.[1]

Blair, who is 6 feet tall and weighs 200 pounds, and who was 26 years old at the time, came to the Capitol grounds that day wearing a skull-themed neck gator, which he had pulled up

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.   That amount reflects, among other things, damage to the Capitol building and grounds and certain costs borne by the United States Capitol Police.

over his lower face, and Oakley "tactical" gloves; and carrying a lacrosse stick with a large

Confederate battle flag attached to it.   He was also wearing a backpack that contained a knife

with a serrated blade approximately four inches long and a roll of duct tape.

At 5:47 p.m., while on the Capitol's West Lawn, he loudly announced he would not

comply with verbal commands being issued by multiple police officers for him and other rioters

to leave the Lawn, and blatantly encouraged other rioters to do the same.   He then pushed his

lacrosse stick against a police officer's chest, and as a result was promptly detained and arrested.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters breached fencing and barricades set up around

the Capitol building, and then broke into building in an effort to disrupt the peaceful transfer of

power after the November 3, 2020 presidential election.   Many rioters attacked and injured law

enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and

others on scene that day, many of whom fled for their safety; and they ransacked this historic

building—vandalizing, damaging, and stealing artwork, furniture, and other property.   Although

the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol

and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to

the violence and destruction that day.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054

(TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers.   The people who were

committing those violent acts did so because they had the safety of numbers.") (statement of

Judge Chutkan).

The day started out calmly enough.   As set forth in the Statement of Offense incorporated into Blair's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m., to certify the Electoral College vote in the 2020 presidential election. At approximately 1:30 p.m., members of the House of Representative and Senate adjourned to their separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the Capitol.   Temporary and permanent barricades were in place along the grounds around the building, and U.S. Capitol Police (USCP) were present to keep the crowd away from the building and the proceedings underway inside.   At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building.

The vote certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured.   USCP members attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers.   All proceedings, including the joint session, were effectively suspended.   The proceedings would not resume until approximately 8:00 p.m., after the building had been secured.   Vice President Pence remained in the Capitol from the time he was evacuated from the Senate chamber until the session resumed.

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 451 U.S. App. D.C. 294, 305, 991 F.3d 1273, 1284 (2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used

dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers.   *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety.   *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (hereafter, "Statement of Architect of the Capitol") (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building.   They caused extensive, and in some instances, incalculable, losses.   This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.   *See* Statement of Architect of the Capitol; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).   The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.    Defendant's Role in the January 6, 2021 Attack on the Capitol

At 5:44 p.m., Blair was present on the West Lawn of the Capitol when members of a Metropolitan Police Department (MPD) civil disturbance unit (CDU), in order to clear the Lawn,[2] began walking forward in a line from the West Terrace toward Blair and other rioters. As the officers proceeded each of them loudly, clearly and repeatedly instructed the rioters to "move back."   Consistent with their training, each officer held their baton laterally in front of them, one hand on each end, and thrust it forward and back as they advanced.

Most of the rioters on the Lawn complied with the officers' commands and headed west, away from the Capitol.   Occasionally a rioter other than Blair would initially refuse to move and an officer's baton would make contact with the rioter's body in the shoulder or torso, as the officer thrusted his baton forward.   The rioter would then comply and join others proceeding away from the Capitol.

By contrast, Blair immediately, loudly and blatantly refused to comply and actively encouraged others to join him.   As shown in various audio-video recordings that captured the incident, Blair began walking back and forth in front of the police line, displaying his flag, and yelling, "Hell naw, quit backing up, don't be scared, we're Americans, don't be scared, let's go quit backing up, quit being scared."   An image from a MPD officer's body-worn camera (BWC) footage showing Blair as he made these statements appears below.

---

[2]When the day began the West Lawn was completely closed off to the public, with appropriate signage and barriers.   As described above, rioters breached the barriers in the early afternoon.



About a minute later, at approximately 5:47 p.m., Blair intentionally positioned himself in front of one of the officers in the CDU line, MPD Officer K.P., deliberately drawing contact with the officer's baton on his (Blair's) left shoulder as the officer thrusted the baton forward. The still image below, from Officer K.P.'s body-worn camera (BWC) recording, shows that moment of contact.



The force of Officer K.P.'s baton only pushed Blair forward a couple of feet.

Remaining upright, and with the obvious intent to encourage other rioters to resist along with

him, Blair turned toward Officer K.P., squared up, and loudly stated, "What's up motherfucker,

what's up, what's up bitch?"   That moment is shown on the BWC recording image below.



Officer K.P. did not respond to Blair's challenge but continued to advance.   When the officer again came close to him, Blair pushed his lacrosse stick into Officer K.P.'s upper chest area.   Blair was then promptly detained and arrested.[3]

A search incident to arrest resulted in the recovery of the knife in Blair's backpack. Blair would later explain that he had the knife because he feared getting "jumped" either by members of "Antifa" or other people.   The arresting officers also noticed the roll of duct tape in the backpack, which Blair acknowledged "looks damn suspicious"; he added, however, that he was carrying the duct tape because he had used it to tape the flag to the lacrosse stick.

### C.  Search Warrant Executed at Blair's Clarksburg Residence

Blair was initially released, in the early morning hours of January 7, 2021, with a citation to appear in D.C. Superior Court.   Thereafter, however, he was investigated by the FBI. Pursuant to that investigation a search warrant was obtained for his residence in Clarksburg, Maryland, which was executed on January 22, 2021.

Blair, who lived at the residence with his mother, was present for the search and cooperated with the search.   The agents recovered the roll of duct tape and the military-style tactical gloves and skull-themed neck gator Blair had been wearing at the Capitol on January 6. The agents also recovered, from within Blair's bedroom, a notebook containing handwritten musings—which Blair would later acknowledge he authored after he returned home following his citation release—that stated:

> Save USA
> RIP Covid victims, Officer Brian Sicknick, David Dorn
> 1.    Wasn't there for violence / or to overthrow
> 2.    Jail story

---

[3]In the process of detaining him, Officer K.P. and other officers struck Blair with their batons, about his body and head, causing physical injuries that required Blair's hospitalization.

3.      Polarization of USA / Exploitable weaknesses unique
[illegible word]
–      Solid media
–      News dividing us
–      Normalization of political violence / Burning businesses
–      Tribalism
4.      Hypocricy [sic]

The agents also found an AR-15 rifle, a loaded ammunition magazine for the rifle, a rifle

stock, and additional rifle ammunition.   The agents determined that, at the time of the search,

the rifle was lawfully possessed by Blair, and found documentation that Blair had purchased the

rifle on May 21, 2020.   Accordingly, neither the rifle nor any of the ammunition was seized.

Significantly, however, Blair's mother, who was also present for the search, denied

knowing that the rifle and ammunition were in the residence.

### D.  Blair's Post-arrest Statements

An arrest warrant was thereafter obtained, charging Blair with various offenses he

committed during the Capitol attack, including two felonies:   assaulting an officer with a

dangerous weapon, in violation of 18 U.S.C. § 111(b); and impeding an officer during a civil

disturbance, in violation of 18 U.S.C. § 231(a).   That warrant was executed on February 15,

2021.   Through an attorney, Blair agreed to surrender.   He thereafter waived his *Miranda* rights

and was interviewed.

In the interview Blair claimed that on January 6, 2021, he drove from his home in

Clarksburg, departing at about 3 or 3:30 p.m., to Washington, D.C., and found parking in a

garage "near L Street."   He advised he then walked to the Capitol grounds, which he claimed

took about an hour.   He acknowledged being on the Capitol grounds when the police began

telling people to move back.   He claimed he was "pushed from behind" by an officer, which

10

angered him and prompted him to "cross check" the officer with the lacrosse stick he was

carrying.   According to Blair, he did not come to D.C. on January 6 to go into the Capitol, but

instead traveled to D.C. that day to "fight Antifa."

Blair also explained in the year leading up to the attack on the Capitol he had engaged in

on-line social media discussions with a person he knew only by a first name—which Blair

provided—and that in these discussions he and the other person made anti-Semitic remarks,

blamed Israel for the world's problems, and made statements about "bankers" "running the

country" and the world.   Blair further explained that as a result of these discussions he came to

believe the United States was "falling apart" and that he had to "stand up" to Communism.[4]

Blair advised that he was "immediately remorseful" for his actions following his initial

arrest on January 6.   He also claimed that he had had no intention to disrupt the congressional

proceedings taking place that day.

### III.     THE CHARGES AND PLEA AGREEMENT

On November 10, 2021, a grand jury returned a superseding indictment charging Blair

with Assaulting an Officer with a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and

(b) (Count One); Interfering with an Officer During a Civil Disorder, in violation of 18 U.S.C.

§ 231(a)(3) (Count Two); Obstruction of an Official Proceeding, in violation of 18 U.S.C.

§ 1512(c)(2) (Count Three); Entering or Remaining in any Restricted Building or Grounds with a

Deadly or Dangerous Weapon in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count

Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or

Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Five); Engaging

---

[4]It is worth noting that the defendant acquired the previously mentioned AR-15 in May 2020, during these
discussions.

in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A) (Count Six); Unlawful Possession of a Dangerous Weapon on Capitol Grounds or in Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(1)(A)(i) (Count Seven); Disorderly Conduct on Capitol Grounds or in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D (Count Eight); Engaging in Act of Physical Violence in the Capitol Grounds or in Capitol Buildings in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Nine).

On March 29, 2022, pursuant to a plea agreement, the defendant pled guilty to Count Two, Interfering with an Officer During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). He now faces sentencing on that Count, with the other counts to be dismissed after he is sentenced.

## IV.    STATUTORY PENALTIES

As noted in the plea agreement, the defendant faces up to 5 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.   The United States Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing.   *Id.* at 49.

12

The U.S. Probation Office, on June 8, 2022, distributed a draft Pre-Sentence Report setting forth its guidelines analysis for the sole count of conviction in this case.   The government agrees that the draft PSR correctly uses USSG § 2A2.2 (Aggravated Assault) to determine the base offense level, notwithstanding that the parties, in the plea agreement in this case, agreed that USSG 2A2.4 (Obstructing or Impeding Officers) determined the base offense level.   The government also concurs with the determination in the draft PSR that the specific offense characteristic set forth in USSG § 2A2.2(b)(2)(B), the use of a dangerous weapon other than a firearm, also applies.   As a result the draft PSR's guidelines calculation yields a higher total offense level, 15, than the total offense level, 11, set out in the plea agreement, and yields a correspondingly higher range of imprisonment, 18 to 24 months versus 8 to 14 months.   The government nonetheless believes that a sentence of imprisonment within the range contemplated by the plea agreement, 8 to 14 months, will accomplish the government's sentencing goals and that the Court should therefore impose a sentence within that range.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   Some of the factors this Court must consider include:   the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, *id.* § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, *id.* § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, *id.* § 3553(a)(6).   In this case, as described below, application of the Section

3553(a) factors supports the imposition of a three-month period of imprisonment, followed by supervised release that includes as a condition a five-month period of home confinement.

A.      **Nature and Circumstances of the Offense**

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.   It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant charged in connection with the attack should be sentenced based on his or her individual conduct, anyone who was unlawfully on the Capitol grounds during the attack, or who during the attack assaulted members of law enforcement or damaged property, did so under the most extreme of circumstances, to which each individual's conduct directly contributed.

A Court must assess a Capitol rioter's conduct on a spectrum.   This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include:   (1) whether, when, and how the defendant unlawfully entered the Capitol grounds or the Capitol building; (2) whether the defendant engaged in or encouraged violence against any person; (3) whether the defendant engaged in or encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the attack, the defendant destroyed evidence; (6) the length of the defendant's time on the grounds, or inside the building, and exactly where the defendant traveled on the grounds or in the building; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of

remorse or contrition.   While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

In this case, the nature and circumstances of this defendant's crime supports imposition of a sentence of imprisonment for three months followed by five months of home detention.

By his own admission, the defendant traveled approximately 30 miles, from his home in Clarksburg to D.C., for the express purpose of engaging in violence with other persons, i.e., to "fight Antifa."   After parking, he then spent up to an hour walking to the Capitol, carrying a weapon with him, a knife.

Upon reaching the Capitol grounds, in order to get onto the West Lawn, Blair would have had to climb over barricades, or at the very least walk past barricades that had plainly been unlawfully breached shortly before.   He then joined numerous other rioters on the West Lawn, wearing a menacing face-covering and openly displaying a symbol, the Confederate battle flag, that he very likely knew would antagonize any ideological opponent he might encounter.

He of course never had such an encounter and never had to fight any Antifa members. Nonetheless, he would later try to justify his conduct, to himself, as an attempt to "save" the country, clearly implying that in his view the country needed to be saved from what was happening at the Capitol on January 6, 2021, i.e., from the certification of the 2020 election.

Once on the grounds Blair openly resisted, and encouraged others to resist, lawful police commands to leave the area, commands that were issued after the police had endured assaults in and around the Capitol earlier that afternoon.   When after a few moments Blair could not find any allies in his effort, he brazenly attempted to start a physical fight with a police officer, intentionally positioning himself in front of the officer so the officer's baton would make contact

with him; and then challenged the officer to a fight and intentionally struck the officer with a lacrosse stick.   The defendant's actions on January 6, 2021 show a willingness to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed law enforcement.

 After the riot, when interviewed by law enforcement, he falsely claimed that the officer he challenged and taunted had "pushed" him "from behind."

Nonetheless, it should not go unnoted that the defendant expressed remorse, which the government acknowledges to be genuine, immediately after being detained, even though he had suffered significant injuries at the hands of the officers he had defied.   He then assisted the investigation, by cooperating during the execution of a search warrant at his residence, and by participating in a lengthy interview.   In addition, he later voluntarily reviewed with an FBI agent the contents of his Facebook account.

### B.  The History and Characteristics of the Defendant

The defendant in this case has no prior criminal history, either arrests or convictions.   He is a high-school graduate, with some college education.   Leading up to his involvement in the Capitol riot, he also seems to have made attempts to maintain steady employment.   There is also evidence that he has over-used marijuana, but there is no indication he ever used other illicit drugs or that he has abused alcohol.

Like many, his parents divorced when he was a young boy--which was not that long ago for him--but he apparently is on good terms with both of them.

Significantly, however, the defendant appears to have embraced anti-Semitism and related ideologies of hate in the months leading up to the riot.   This did not come from his home

environment but by his own willful engagement with another person with whom he only had on-line contact.   It is important to note that this did not occur in his teen years, but when he was already 25 years of age, and therefore mature enough to know better.

The draft PSR makes note of certain post-crime health diagnoses of the defendant that the government will address, if necessary, in a sealed context.   The draft PSR also mentions that the defendant advised the writer of other health-related issues that pre-dated the riot by several years.

On balance, the defendant's history and characteristics are mitigating factors with respect to the sentence she should receive.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law.   "The violence and destruction of property at the U.S. Capitol on January 6, 2021 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[5]   As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Blair's criminal conduct, physically interfering with, resisting and taunting a law enforcement officer, and encouraging others to do the same shows extreme disrespect for the law.

The rule of law was not only disrespected; it was under attack that day.   A sentence without incarceration could encourage further disrespect and attacks.   *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

---

[5]Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

D.        **The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. *See* 18 U.S.C. § 3553(a)(2)(B), (C); *United States v. Russell*, 390 U.S. App. D.C. 100,

107, 600 F.3d 631, 637 (2010).

### *General Deterrence*

A sentence of imprisonment is needed "to afford adequate deterrence to criminal

conduct" by others.   18 U.S.C. § 3553(a)(2)(B).   The need to deter others is especially strong in

cases involving domestic terrorism, which the breach of the Capitol certainly was.[6]   The

demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly

every case arising out of the violent riot at the Capitol.   The violence at the Capitol on January

6, 2021 was cultivated to interfere, and did interfere, with one of the most important democratic

processes we have:   the peaceful transfer of power.   As noted by Judge Moss during sentencing,

in *United States v. Paul Hodgkins*, 1:21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed.   When a
> mob is prepared to attack the Capitol to prevent our elected
> officials from both parties from performing their constitutional and
> statutory duty, democracy is in trouble.   The damage that [the
> defendant] and others caused that day goes way beyond the
> several-hour delay in the certification.   It is a damage that will
> persist in this country for decades.

Tr. at 69-70.   Indeed, the attack on the Capitol means "that it will be harder today than it was

seven months ago for the United States and our diplomats to convince other nations to pursue

---

[6]*See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

18

democracy.   It means that it will be harder for all of us to convince our children and our

grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence.   This was not a protest.   *See id.* at 46

("I don't think that any plausible argument can be made defending what happened in the Capitol

on January 6th as the exercise of First Amendment rights.").   And it is important to convey to

future rioters and would-be mob participants—especially those who intend to improperly

influence the democratic process—that their actions will have consequences.   There is possibly

no greater factor that this Court must consider.

***Specific Deterrence***

The need for the sentence to provide specific deterrence to this defendant, the

government would concede, is somewhat minimal, given his genuine expressions of remorse—

immediately after being detained--and his later cooperation in the investigation that targeted him.

It is nonetheless troubling that the defendant would attempt to justify his actions, even to

himself, based on a need to "save" America.   Such a sentiment suggests the defendant might

engage in similar criminal conduct in the future, should he come to believe again, contrary to all

logic, that the country is again in need of saving.

### E.     The Importance of the Sentencing Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v.*

*United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has

"'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding

inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108.   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.   As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data.   U.S.S.G. §1A1.1, intro., comment 3.   More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process.   See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines).   Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case.   Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005).   "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).   In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"   *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark.   As

this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot.   This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis.   In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

###    F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that the defendant and others like him committed on January 6 are unprecedented.   These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases.   To try to mechanically compare other defendants convicted under 18 U.S.C. § 231(a)(3), for offense committed prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

With respect to the Capitol riot itself, however, there have been three other cases, involving four defendants, in which the defendants were sentenced following convictions (all pursuant to plea agreements) on a single count of violating 18 U.S.C. § 231(a)(3).   Those cases are:   *U.S. v. Daniel Johnson*, 1:21-cr-407-DLF-1 and 1:21-cr-407-DLF-2 (defendants are father and son, respectively); *U.S. v. Nolan Cooke*, 1:22-cr-00052-RCL; and *U.S. v. Derrick Evans*, 1:21-cr-00337-RCL.   All of these defendants were sentenced to guideline-compliant prison terms, but only Daniel Johnson and Cooke faced guideline ranges comparable to the range Blair faces under his plea agreement.   In Daniel Johnson's case that was a range of 4 to 10 months and in Cook's case that was a range of 8 to 14 months (i.e., identical to the range faced by Blair).

Daniel Johnson was ultimately sentenced to four months in prison and Cooke was ultimately sentenced to 12 months and one day in prison.

The government submits that Blair is deserving of a greater sentence than Daniel Johnson, but a lesser sentence than Cooke, for the following reasons.    With respect to Daniel Johnson, he, unlike Blair, did not utilize a weapon when he interfered with police officers. However, Cooke, like Blair, wielded a flagpole, albeit a traditional one, during the attack. Moreover, Cooke used his flagpole in an attempt to break an outer window of the Capitol and actively encouraged other attackers to enter the building.   In contrast, Blair never made it to the building itself, did not himself attempt to cause property damage, and encouraged other attackers only to remain on the West Lawn, not to enter the building.[7]

Accordingly, the government's recommended sentence for Blair, if accepted by the Court, will not result in unwarranted sentencing disparity.

## RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[8]   *United States v. Papagno*, 395 U.S. App. D.C. 82, 85, 639 F.3d 1093, 1096 (2011).   Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S.

---

[7]It should be noted that the government advocated for an 11-month prison sentence for Cooke, but that Cooke himself requested a sentence of 12 months and a day, which the court imposed, in order to be eligible for the sentence-reduction benefits in 18 U.S.C. § 3624(b).

[8]The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here.   *See* 18 U.S.C. § 3663A(c)(1).

411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, *id.* § 3663(b).   At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement."   *Id.* § 3663(a)(3); *see United States v. Anderson*, 383 U.S. App. D.C. 361, 367-68, 545 F.3d 1072, 1078-79 (2008)

Those principles have straightforward application here.   The victim in this case, Officer K.P., did not suffer bodily injury as a result of Blair's act of physical interference with him.   The parties agreed, as permitted by statute, that the defendant will pay $2000 in restitution to the Architect of the Capitol.[9]   As set out in the plea agreement reflect, the riot at the Capitol caused approximately $1,495,326.55 in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021.[10]   Blair's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

## CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 6 months, followed by a three-year period of supervised release with the condition the defendant serves two months of home detention, a sentence which is at the low end of the applicable Guideline range.   The Court should also order that the defendant pay $2000 in restitution and the mandatory $100 special assessment but should not impose a fine.

---

[9]Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* USSG § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA.   *See United States v. Emor*, 850 F. Supp. 2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[10]As discussed *supra*, more recently the loss figure has been recalculated and updated to approximately $2.7 million.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


by:    */s/Michael C. Liebman*
Michael C. Liebman
Assistant United States Attorney
D.C. Bar no. 479562
601 D Street, N.W., room 4-1501
Washington, D.C.   20530
(202) 252-7243
michael.liebman@usdoj.gov

24