**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :     Case No.: 1:21-cr-00186-CRC |
| | : |
| DAVID ALLEN BLAIR | : |
| | : |
| Defendant | : |

<b><u>DEFENDANT'S SENTENCING MEMORANDUM</u></b>

David Allen Blair, defendant, by and through his counsel, Terrell N. Roberts, III, submits this memorandum to aid in sentencing.

**<u>Recommendation of Sentence</u>**

The Court is respectfully requested to impose a sentence of probation. This is the appropriate sentence given that the defendant never entered the Capitol building and arrived late; that he promptly accepted full responsibility for his actions; that he suffered serious head injuries when a police officer struck him in the head with a police baton several times; that he was cooperative with federal authorities, enabling the government to fully assess his involvement; and that he does not have a criminal record and is a very low risk of another crime.

**<u>Legal Standard Applicable to Sentencing</u>**

A district court should begin all sentencing proceedings by correctly calculating the range of the sentence under the United States Sentencing Guidelines. *Rita v. United States*, 551 U.S. 338, 347-348 (2007). The guidelines, which are not mandatory, *United States v. Booker*, 543 U.S. (20050, are "a starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 51 (2007). They "are not the only consideration, however." *Id*. After giving the parties "an opportunity to argue for whatever sentence they deem appropriate, the district judge should then

consider all of the § 3553(a)[1] factors to determine whether they support the sentence requested by the party." *Id*. The district judge "must make an individualized assessment [of the appropriate sentence] based on the facts presented." *Id*.

### Sentencing Guidelines Calculation

The defendant has pleaded guilty to the offense of obstructing and hindering a law enforcement officer incident to and during the commission of a civil disorder in violation of 18 U.S.C. § 231(a)(3)(second count of the superseding indictment). He has agreed to the Government's sentencing guideline calculation as set forth in the Government's plea agreement letter dated March 8, 2022, to wit: a Base Offense Level of 10 (U.S.S.G § 2A2.4(a) +3 for Specific Offense Characteristic of physical contact, resulting in an Offense Level of 13. Applying a two-level reduction for acceptance of responsibility, the final Offense Level is 11. Given that the defendant has 0 criminal history points, the guidelines' estimated range of imprisonment is 8 months to 14 months.[2]

The applicable guidelines range places the defendant in Zone B of the Sentencing Table. For individuals in Zone B, a sentence of probation is authorized if the Court "imposes a condition or combination of conditions requiring intermittent confinement, community confinement or home detention as provided in subsection (c)(3) of § 5C1.1 (Imposition of a Term of Imprisonment)." U.S.S.G. § 5B1.1(a)(2). Subsection (c)(3) of § 5C1.1 states:

> If the applicable guideline range is in Zone B of the Sentencing Table, the minimum term may be satisfied by—
>
> a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention for imprisonment according to the schedule in subsection (e).

---

[1] Referring to 18 U.S.C. § 3553(a).
[2] A Presentencing Investigative Report was filed [See, Doc.#54] which calculated a higher sentencing guidelines range of 18-24 months by applying, incorrectly, U.S.S.G. § 2A2.4's Cross Reference. Both the defendant and the Government have objected to the Report's application of the Cross Reference.

Subsection (e) of § 5C1.1 substitutes intermittent confinement, community confinement, or home detention for imprisonment day-for-day.

Two statutes bear mentioning. First, under 28 U.S.C. § 994(j), Congress established a preference for a sentence other than imprisonment in cases where the defendant is a "first offender". That subsection states:

> The Commission shall ensure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.

The defendant is "first offender" under this subsection. 18 U.S.C. § 231(a)(3) makes it a crime to obstruct, impede or interfere with a law enforcement officer in the performance of his duties incident to and during the course of a civil disorder. The offense is not a "crime of violence" because the elements of the offense do not include as an element the use or threatened use of physical force.[3] Nor is the offense an "otherwise serious offense." (Congress' use of the descriptor "otherwise" suggests that the offense must be closely similar to a "crime of violence.") The indictment does not allege that the offense was committed with the use of physical force or threatened physical force. Thus, the offense of obstruction is not an "otherwise serious offense."

Second, 18 U.S.C. §3561 provides that a defendant may be sentenced to a term of probation unless 1) the defendant has been found guilty of a Class A or Class B felony; 2) the offense is one

---

[3] Under 18 U.S.C. § 16, a "crime of violence" is defined as meaning either "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves substantial risk that physical force against the person or property may be used in the course of committing the offense." The offense of conviction, namely, 18 U.S.C. §231 (a)(3), speaks to "any act to obstruct, impede, or interfere" with any law enforcement officer. This language does not translate into an offense that has as an element the use or attempted use, or threatened use of physical force against the person or property of another or one that "involves a substantial risk that physical force against the person or property of another in the course of committing the offense."

3

for which probation has been expressly precluded; and 3) the defendant is sentenced at the same time to a term of imprisonment for the same or different offense that is not a petty offense. None of those are in play. Thus, a term of probation is clearly authorized in this case.

If the Court were to decide that the guidelines provide the correct sentence and impose a term of probation with one of the conditions specified in U.S.S.G. § 5B1.1(a)(2), the most fitting condition is "home detention." This follows from an "individualized assessment of the facts presented in the case" and the factors outlined in 18 U.S.C. 3553(a).

### The Application of the Factors of § 3553(a)

Under 18 U.S.C. § 3553(a), a court shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide for just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect from further crimes of the defendant; and (D) to provide the defendant with needed educational and vocational training, medical care, or other correctional treatment in the most effective manner;

(3) The kinds of sentences available;

(4) The kinds of sentences and the sentencing range established for the applicable category of offense and category of defendant under the U.S.S.G.;

(5) Any pertinent policy statement issued by the Sentencing Commission;

(6) The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

(7) The need to provide restitution to any victims of the offense.

**Nature and Circumstances of the Offense**

The defendant left his home in Clarksburg, Maryland at around 3-3:15 p.m., and drove to Washington, D.C.[4] He estimated that the drive took an hour or so. Ex. 1, p. 33, l. 33, l. 24. He parked his car in a parking lot on L Street, N.W., and walked toward the Capitol. He estimated that the walk took him about an hour and 20 minutes.[5] At some point during that walk, he texted his mother at 5:14 p.m. to let her know that he had parked at a parking garage on L Street, N.W.[6] As he approached the West Lawn of the Capitol, he saw a speaker addressing some people. He listened for about 30 seconds and then walked onto the West Lawn where he saw protestors gathered. Ex. 1, p. 36, l.s 1-6.

The defendant estimates that he arrived at the West Lawn about 10-minutes before his arrest. Ex. 1, p. 30, l. 18. Since the arrest occurred at 5:47 p.m.,[7] this means his initial arrival 10-minutes was at approximately 5:37 p.m. At that time the disturbance at the Capitol was over. By 4:28 p.m., both the House and Senate Chambers were declared to be secure, and by 5:20 p.m., the DC National Guard had arrived.[8] CNN broadcast a report at 5:42 p.m. that "[t]he Sergeant at Arms has announced that the U.S. Capitol Building is now secure, according to press pool reporters." https://www.cnn.com/politics/live-news/congress-electoral-college-vote-count-2021/h_71a3aeeb0c13370d8d089e593c149fe8.

---

[4] Exhibit 1, excerpts of defendant's statement to Special Agent Jonathan Fuggit of the Federal Bureau of Investigation, Feb. 17,2021, p. 31, l. 3.
[5] Ex. 1, p. 34, l.s 4-13.
[6] A screen-shot from the phone of Gayle Blair, the defendant's mother, bears a time of  is attached as Ex. 2.
[7] Statement of Offense, Doc.# 51, p. 4.
[8] U.S. Senate Report of the Committees on Homeland Security and Governmental Affairs and Rules and Administration, p. 84. https://www.rules.senate.gov/imo/media/doc/Jan%206%20HSGAC%20Rules%20Report.pdf. The Senate Report stated: "DCNG (District of Columbia National Guard) personnel ultimately did not arrive at the Capitol until approximately 5:20 p.m., … . By that time, both the House and Senate chambers had already been declared secure."). It further stated that "the Senate Chamber was secure by 4:19 p.m. and the House Chamber was secure by 4:28 p.m." *Id*., n.606, p. 84(*citing* U.S. CAPITOL POLICE TIMELINE OF EVENTS FOR JANUARY 6, 2021 ATTACK (2021) n. 61, p. 20).

The defendant's case is distinguishable from many because he never entered the Capitol. Remarkably, he was a long way from the Capitol. Examination of the available video footage points to his location with reasonable accuracy as close to two large trees on the West Lawn approximately 600 ft. from the Capitol building.[9] The location was at the far west end of the West Lawn, approximately 100 ft. from Peace Circle, on 1st Street, N.W.

Due to his late arrival to the Capitol grounds, the defendant was unable to discern that the West Lawn was restricted or closed.[10] He told Agent Fuggit that he did not recall seeing any barriers that he had to cross that made him think that he should not be where he was on the West Lawn. Ex. 1, p. 37, l. 13. This is consistent with the substantial video and photographic evidence which shows the general absence of signs, barriers, and fencing.[11] Why is that? It is because signs and barriers were removed or taken down during the peak of disturbance at the Capitol. One investigative journalist who has studied this issue closely has raised a perfectly legitimate question, namely, why have persons who are seen on video footage systematically cutting or taking down barriers, fencing and signs not been publicly identified or charged by the Government?[12]

The defendant was truly ignorant of any breach of the Capitol prior to his arrival.[13] In answering questions put to him by Sgt. Fabian Ferrara on January 6th, the defendant indicated that he did not know that anyone had entered the Capitol. Ex. 5, BWC of MPD Sgt. Fabian (18:53:10).

---

[9] See Ex. 3, Affidavit of Anne Moser.
[10] See Affidavit of Anne Moser attached, Ex. 4.
[11] Id.
[12] https://www.revolver.news/2021/12/damning-new-details-massive-web-unindicted-operators-january-6/#:~:text=This%20same%20breach%20team%20then%20proceeded%20to%20haul%20the%20metal%20police%20barricades%20off%20to%20the%20side%2C%20tear%20down%20%E2%80%9CRestricted%20Area%E2%80%9D%20signage%2C%20and%20systematically%20remove%20protective%20fencing%20from%20the%20Capitol%20lawn.%20Ordinarily%2C%20with%20no%20barriers%20in%20place%2C%20this%20entire%20area%20is%20open%20to%20the%20public.
[13] Defendant had not watched the news before driving to the Capitol, but he did see watch some clips of the Capitol on Twitter and YouTube. He stated that he did not see any "crazy stuff" going on in those clips. Ex. 1, p. 31, l. 17. Id., p. 30.

In addition, when interviewed by FBI agent Fuggit, the defendant stated that he did not know that anyone had entered the Capitol prior to his encounter with the police and that he thought it was not possible for anyone to do so. Ex. 1, p. 31, l. 17.

At some point near in time to the defendant's arrival, Metropolitan Police Department's Civil Defense Units formed a line and began to move across the West Lawn to move protestors off the lawn. Exhibit 5, BWC of Officer Austin Smith, 17:42:10. As the line moved, officers chanted "move back," and repetitively extended their batons. That is all he heard in terms of an "order." Although it appears that a dispersal order was broadcast over a PA system at the Capitol itself, it was not loud enough to carry over the noise to the defendant who was far from the Capitol building. Contrary to statute applicable to the Metropolitan Police Department, the police failed to use bullhorns or PA systems at multiple locations to ensure that persons at all locations of the West Lawn were aware.[14] The defendant acknowledged to Agent Fuggit that he saw the line of officers "trying to push people back," but he said that he "didn't understand why they were." Ex. 1, p. 40, l. 40. A clearly intelligible dispersal order that included a warning of the impending curfew and advised routes for leaving the area may have helped to clarify the situation for the defendant at the time.

As the line approached, the defendant was milling in the sparse crowd on the West Lawn. Ex. 5, BWC Austin Smith, 17:46:08. He was in disbelief as the police moved protestors off the West Lawn. He moved back initially when the line approached. However, he changed his mind

---

[14] § 5-331.07, subsection (e)(1), of The District of Columbia Rights and Police Standards Act of 2004 ("the Act"), provides:
   "If and when the MPD determines that a First Amendment assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly audible and understandable order to disperse using an amplification system or device, and shall provide the participants a reasonable and adequate time to disperse and a clear and safe route of dispersal." Subsection (2) that the "*MPD shall issue multiple dispersal orders and, if appropriate, shall issue the orders from multiple locations*." The orders shall inform persons of the routes by which they may disperse and shall state that refusal to disperse will subject to the arrest."

and decided to stay where he was since he thought he had the right to be where he was and exercise his First Amendment right of free assembly.  That decision, however, led to the unfortunate events which were to happen next.  The defendant began to parade with his flag in front of the officers and he encouraged others not to move back further.  Then, as the police line moved closer, Officer Kevin Peralta shoved the defendant.  The shove or push was hard and strong enough to knock an average man off his feet.  It jarred the defendant whose attention momentarily had turned toward the people behind him and away from the line of officers. Ex. 5, YouTube Footage of the Incident. [15]

Here the District of Columbia's First Amendment Rights and Standards Act of 2004 becomes relevant.  It requires police officers to "first seek to enforce the restrictions [to assembly] through voluntary compliance and then seek, as appropriate, to enforce the restrictions by issuing citations to, or by arresting, the specific noncompliant persons."[16] In addition, the Civil Disturbance Unit's standard operating procedures, ⁋D(2)(a), direct that officers "who encounter a situation where the possibility of violence or resistance to lawful arrest shall, if possible, first attempt to defuse the situation through advice, warning, verbal persuasion, tactical communication, or other de-escalation techniques." Although the defendant's emotions were clearly high at the time, the officer, who was in a superior position of a trained police officer who

---

[15] The Act, § 5-331.07, subsection (b)(1), states: "[w]here participants in a First Amendment assembly fail to comply with reasonable time, place, and manner restrictions, the MPD shall, to the extent reasonably possible, first seek to enforce the restrictions through voluntary compliance and then seek, as appropriate, to enforce the restrictions by issuing citations to, or by arresting, the non-specific non-compliant persons, where probable cause to issue a citation or arrest is present."

[16] Defendant told Agent Fuggit that he planned to let the police arrest him as a sign of defiance or protest. Ex.. 2, p. 38, l. 14. According to D.C. Code, §5-331.07, "[w]here participants in a First Amendment assembly fail to comply with reasonable time, place, and manner restrictions, the MPD shall, to the extent reasonably possible, first seek to enforce the restrictions through voluntary compliance and then seek, as appropriate, to enforce the restrictions by issuing citations to, or by arresting, the non-specific non-compliant persons, where probable cause to issue a citation or arrest is present." Thus, if Officer K.P. had used such de-escalation measures, including simply issuing a citation to the defendant or arresting him, it would have led to a significantly different outcome.

ought to know better, failed to follow his department's standard procedures which called for the use of de-escalation measures in this situation. The brute force which led to provoking the defendant was not called for.

The defendant had youth and athleticism on his side and regained his balance. He turned to face the officer. Provoked and lost in his emotions, he uttered a few expletives and pushed Officer Peralta with his flagpole, which he had made from a lacrosse stick. Peralta, who was not harmed, responded with a heavy strike to the top of the defendant's skull with his baton.[17] He continued swinging and struck the defendant two more times in the head. This was a prohibited use of force banned by the officer's standard operating procedures (not to mention universally prohibited because a blow to the head is capable of causing death or serious bodily injury). Other officers joined in the fray and struck the defendant with baton strikes. An investigation by Internal Affairs Unit determined that the defendant was struck approximately 12 times with batons.[18] It was determined that Officer Peralta struck the defendant a total of three times in the head and twice on the legs.[19] Other officers did not strike the defendant on the head, according to the investigation. The defendant was staggered by the initial blow to the head and lost consciousness for a brief moment. Nevertheless, he was able to remain on his feet as he struggled to maintain a hold on his lacrosse stick. Eventually, he was subdued and handcuffed without further resistance.

A senior officer in a command walked over to the defendant who was seated on the ground. The officer said: "Can you walk man? Its all over. You're in handcuffs." The defendant acknowledged and said: "No, I'm done, man. I'm tired. I am giving up on my country. I don't have anything against you." Ex. 5, BWC Aaron Smith, 17:48:23.

---

[17] See Exhibit 3.
[18] See Exhibit 6, Presentment Report Concerning the Use of Force (Baton Strikes), p. 3.
[19] Id.

9

Officers began to walk the defendant in the direction of the Capitol. Within 3-4 minutes, he apologized to the officers present. Ex. 5, BWC Aaron Smith, 17:50:02.[20] He also spoke about what just happened, saying that one of the officers had taken a "swing" at him and "flipped the switch." *Id*.

The officers continued to walk the defendant and stopped on a platform. The defendant saw that officer was looking at the confederate flag the defendant had been carrying. The defendant addressed that officer and in part said: "I apologize. I don't have any hatred for anybody of any race. That's what my family fought for. I am tired of giving up my country. I want America for everybody." Ex. 5, BWC Austin Smith, 17:52:10.

The officers then got the defendant inside the Capitol. He saw evidence of chemical spray everywhere and a state of disarray. This was the first time he saw what had happened in the Capitol. The defendant told Agent Fugitt that he could tell that the police had "went through hell that day."[21]

The defendant was actively bleeding from lacerations to his head. After processing in the Capitol, he was taken outside for transport to George Washington Hospital. MPD Sgt. Fabian Ferrara walked up and asked him what had happened. The defendant answered and stated that he got pushed by an officer and that he pushed him back with his lacrosse stick. Ex. 5, BWC Sgt. Fabian Ferrara, 18:51:30. In this short interview, the defendant accepted personal responsibility for his actions. *Id*.

---

[20] The extent to which the defendant apologized and took responsibility was remarked upon by FBI Agent Fuggit. In his interview with the defendant, he stated that the defendant apologized to the police within 10 minutes of the incident. Ex. 1, p. 42, l.s 6-13.
[21] Ex. 1, p. 48, l. 4.

The defendant arrived at George Washington University Hospital at 8:00 p.m. on January 6, 2021.[22]  He provided a history of being struck 3-4 times in the head with police batons.  Ex. 7, p. 36.  He told the doctor that he may have lost consciousness for less than a second.  The doctor who examined the defendant recorded that he had a ten (10) cm. superficial laceration to the center of the scalp and a second "complicated laceration" six (6) cm. to the left frontotemporal area. Ex. 5, p. 28 Nine (9) staples were used to close the central laceration and seven (7) sutures were used to close the left wound.  The defendant was diagnosed with a concussion.  He was appropriately warned of the potential sequelae of a concussion and instructed to follow up with his primary care provider within 24 hours.

The defendant was released approximately 24 hours after his arrest on personal recognizance.

In the weeks which followed, the defendant cooperated with FBI agents, including the lead agent, Fuggit.  A search warrant was executed at the defendant's house.  The defendant bagged up his clothing and other evidence and had it ready for the officers at the time a search warrant was executed.  This was something that Agent Fuggit took note of.[23]  The defendant also agreed to allow Agent Fugitt to interview him extensively in the presence of his lawyer.  At the end of the interview, Agent Fugitt told the defendant: "You took responsibility for your actions" and that "you are doing the right thing and you are going to come out on the side of this like I hope for you, all right?" Ex. 1, p. 73, lines 20-21 and p. 75, lines 1-3.  The defendant also met with Agent Fuggit and Agent Mutafa Kutlu at his attorney's office on May 24, 2021.  These agents reviewed the defendant's social media postings.  At the conclusion of the meeting, Agent Fuggit addressed the

---

[22] Portions of the Emergency Room records from the hospital are attached as Ex. 7.
[23] Ex. 1, p. 48, line 1-14.

11

defendant and stated that he did not believe that the defendant had any plan to do harm at the Capitol on January 6th and that he had not brought any firearms with him to the Capitol.[24]

### History and Characteristics of the Defendant

The defendant is 27 years of age. His parents were divorced when he was in high school. He is an only child.  The defendant's father now resides in Havre de Grace, Maryland.  He works as a vending machine repairman. He is also an accomplished Blue Grass musician.  The defendant's mother is a special education teacher in the Frederick County, Maryland school system.  In her spare time, she enjoys riding horses and instructing youngsters how to ride.

The defendant played youth athletics of all kinds.  At a young age, he was recognized for his abilities in the sport of lacrosse.  Mr. Philip Gash, a coach of the sport, took an interest in the defendant and fostered the youth's participation and advancement in the sport.  See Gash's letter to the Court attached.[25]  Mr. Gash became an assistant coach of the high school lacrosse team on which the defendant played. He stated that the defendant was "extremely competitive and [was] unafraid of a challenge." He also noted that the defendant got along with everyone. Mr. Gash decided to hire him to work in at a store which sold lacrosse gear and equipment.  According to Mr. Gash, the defendant "showed an exceptional customer service and work ethic." Mr. Gash, who was a manager at several stores, continued to provide the defendant with employment opportunities, hiring him for three separate jobs.  He stated that the defendant "always had respect and got along with all races and that he was always liked by everyone."  He stated that he knows the defendant "to have a great heart, caring, compassionate and always willing to help someone less fortunate in need."

---

[24] This is in accordance with counsel's notes which were written shortly after the meeting.
[25] See Exhibit 8, Letter of Philip Gash.

Mr. Gash trained the defendant in lacrosse to "never back down from a challenge." He believes this "had an effect on the situation he found himself in" when he had a physical altercation with the officer.

The letters of the defendant's mother and a neighbor reveal a caring and sensitive individual who went out of his way to help others. Ms. Gayle Blair said that her son "cared deeply of his neighborhood, friends and family." She stated that "[n]eighbors readily called upon David to help with house chores, yard work and caring for pets," and "rely upon David's expertise and advice with vehicle repairs and purchases."[26] She stated that her son "would spend hours visiting and caretaking for his grandmother feeding her when she was no longer able to do so herself" and providing "tremendous support to me following the break-up of my marriage." Ms. Nina Bell, who has known the defendant since 2001, refers to the defendant as "respectful, polite [and] caring."[27] She regards the defendant was a "good role model" for her own son. She described him as "a big help to me several times over the years," including, to name just a few, moving a heavy stationary bike into her home, helping her to jump-start her car, and taking her car to the carwash.

### Defendant's Pride in Country and Family History

Mr. Gash noted that he and the defendant spoke often about their past family members who served in the military. He said that the defendant "cared about the history of our nation" and that he was proud of past family members who served their country in the military. Those servicemen who served were Alvin Blair (POW WW2), Major William Sinkler Manning (Distinguished Service Cross- KIA France WW1), and Wyndham Meredith Manning (Distinguished Flying Cross WW2). The defendant's maternal grandfather, John Hearon, was a

---

[26] Exhibit 9, Letter of Gayle Blair.
[27] Exhibit 10, Letter of Nina K. Bell, July 24, 2021.

graduate of the Citadel in 1941 and served in the United States Army in World War II.  He was also a scientist and educator.  He received a Master of Science degree in biochemistry in 1942 and a Ph.D. in biochemistry from the University of Michigan in 1944. He was the second person ever to be granted a Ph.D. from the University of Chicago in Mathematical Biology.  He became a senior mathematician at Oak Ridge National Laboratory and a charter member of the Society of Mathematical Biology.  As a child, the defendant knew his grandfather who he proudly remembers.

The defendant's roots extend even deeper into this country's history than World War II. His mother hales from Sumter, South Carolina. She is related by marriage to a family known as the Hamptons, who figured prominently in the history of that State. Wade Hampton famously participated in the Revolutionary War.  His grandson, Wade Hampton, III, was an officer in the Confederate Army and the war was elected Governor of the State of South Carolina.  His statute was in Statuary Hall of the US Capitol for many years until it and other statues of like persons from the South were removed in 2020 by congressional action or request of state authorities.

In 2020, riots occurred which became a form of cultural revolution.  Part of that revolution led to the toppling and official removal of many statues commemorating the political and military historical figures of the South.  The defendant cared deeply about his family's heritage, and as Mr. Gash noted, the events of 2020 had a "profound effect on [the defendant] mentally."  The defendant's mother noted that the defendant "became increasingly upset with what he felt was American history being erased."[28]

Caught in this whirlwind, the defendant's feelings about the events of 2020 affected his decision to come to the Capitol on January 6, 2021.  But in the final analysis, he came to exercise

---

[28] Exhibit 9, Letter of Gayle Blair.

his right to peacefully protest and engage in assembly. The defendant's exercise of his First Amendment rights is not dependent upon what his particular political views are and clearly should not dictate the sentence which should be imposed.

**Medical History**

As previously mentioned, the defendant suffered lacerations to the head and a concussion when he was struck on the head with a baton. Dr. Kristen Raphael examined the defendant in the Emergency Room of George Washington Hospital on the evening of January 6, 2021. Using her own phone, she took photographs of the injuries to the scalp. Copies of these photographs are attached.[29]

The lacerations left visible scars on the defendant's scalp.[30]

The defendant was seen by a doctor at Kaiser Permanente on January 11, 2021, for follow-up evaluation and treatment of his head injury. He complained of confusion, loss of appetite, and headaches.[31] He was referred for a neurology consult which was undertaken on January 12, 2021. The history indicated that the defendant had momentary loss of consciousness when hit over the head with a baton, with the onset of headaches occurring after the injury. The location of headaches were apical, bilateral, and occipital and 4-9 /10 in severity. The headaches reportedly lasted 2 hours at a time. Associated concussion symptoms were nausea, vomiting, decreased appetite, weight loss, insomnia, zoning out for 10 minutes at a time, losing train of thought, sensitivity to light, and double vision. A diagnosis of concussion and post-concussion syndrome and headaches were made. The defendant was prescribed Zofran for vomiting and Elavil (amitriptyline) for headache. The defendant's staples and sutures were removed on January 18,

---

[29] Ex. 11, photographs taken by Kristin Raphael, M.D.
[30] Ex. 12, photographs of head scars, David Blair.
[31] Ex. 13, Records of Kaiser Permanente, p. 9.

2021. On March 19, 2021, he had a neurological follow-up for post-concussion syndrome and headaches, which were noted to be daily and migraine in nature. He was restarted on amitriptyline, which had been stopped due to concerns about another medication to treat another condition. On May 21, 2021, the defendant had an MRI study of the brain. It was read as normal. The defendant had no further medical care for his concussion. He still has migraine headaches which come once or twice a week.

**Purposes of Sentencing**

U.S.S.G. Part B of Chapter Five entitled "Determining the Sentencing" states:

> Probation may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentences, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant.

Federal Sentencing Guide Handbook, 2020-2021 Ed., p. 1585. A sentence of probation in this case will fully achieve the statutory purposes of sentencing.

To sum up, the defendant did not enter the Capitol, but was on the fringes of the West Lawn when he was arrested after a scuffle with the police. He did not injure any officer; nor did he damage or destroy property. He was truly ignorant of the breach of the Capitol when he arrived and did not understand why the police were moving people off of the West Lawn. He came to the Capitol to protest and justly believed he had the right to do so. His emotions got the best of him, and when an officer physically shoved him he shoved him back. He then had to pay a heavy price when the officers showered him with baton blows, causing head injuries, and the wheels of justice began to turn. He expressly apologized within minutes of his arrest and has remained genuinely remorseful. He righted the ship quickly after his arrest by showing respect to law enforcement officers and cooperating fully with the FBI's investigation, enabling the government to determine

the extent of his involvement with the events of January 6th. He has lived his life caring for his family, friends, and neighbors, who think highly of him. The impact of these proceedings and a felony conviction will stay with the defendant permanently, and this is punishment enough. Applying an individualized assessment of the facts presented in this case and the other relevant sentencing factors, a sentence of probation is the appropriate sentence for this defendant, and the Court is urged to impose it.

Respectfully submitted,
**ROBERTS & WOOD**

  /s/ Terrell N. Roberts, III
Terrell N. Roberts, III
DC Bar No. 965061
*Attorney for Defendant*
6801 Kenilworth Avenue, Suite 202
Riverdale, Maryland 20737
(301) 699-0764
(301) 699-8706 Fax
troberts@robertsandwood.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was electronically filed via CM/ECF system on July 6, 2022, and an electronic copy was e-served to:

Michael Liebman, Esq.
Assistant United States Attorney
Office of the United States Attorney, District of Columbia
555 4th Street, NW
Washington, D.C. 20530

  /s/ Terrell N. Roberts, III
Terrell N. Roberts, III