```
1                     IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2
        - - - - - - - - - - - - - - - x
3       THE UNITED STATES OF AMERICA,
                                            Criminal Action No.
4                      Plaintiff,          1:21-cr-00186-CRC-1
                                            Wednesday, July 13, 2022
5       vs.                                 10:13 a.m.

6       DAVID ALAN BLAIR,

7                      Defendant.
        - - - - - - - - - - - - - - - x
8

9       _____

10                    TRANSCRIPT OF SENTENCING HEARING
             HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
11                    UNITED STATES DISTRICT JUDGE
        _____

12      APPEARANCES:

13

14      For the United States:       MICHAEL CHARLES LIEBMAN, ESQ.
                                      DOJ-USAO
15                                    601 D Street, N.W,
                                      Suite 4-1501
16                                    Washington, DC 20530
                                      (202) 252-7243
17                                    michael.liebman@usdoj.gov

18      For the Defendant:           TERRELL ROBERTS, III, ESQ.
                                      ROBERTS & WOOD
19                                    6801 Kenilworth Avenue
                                      Suite 202
20                                    Riverdale, MD 20737
                                      (301) 699-0764
21                                    troberts@robertsandwood.com

22
        Court Reporter:              Lisa A. Moreira, RDR, CRR
23                                    Official Court Reporter
                                      U.S. Courthouse, Room 6718
24                                    333 Constitution Avenue, NW
                                      Washington, DC  20001
25                                    (202) 354-3187
```

```
1                    P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Your Honor, we're on the
3    record for Criminal Case 21-186, United States of America
4    vs. David Alan Blair.
5              Counsel, please approach the lectern and identify
6    yourselves for the record.
7              MR. LIEBMAN:  Good morning, Your Honor; Michael
8    Liebman on behalf of the United States.
9              THE COURT:  Good morning, Mr. Liebman.
10             MR. ROBERTS:  Good morning, Your Honor; Terry
11   Roberts on behalf of David Alan Blair.
12             THE COURT:  Good morning, Mr. Roberts.
13             Mr. Blair, how are you this morning?
14             THE DEFENDANT:  How are you doing, sir?  Good.
15             THE COURT:  Good.
16             And, Mr. Roberts, we have some guests in the
17   audience?
18             MR. ROBERTS:  Yes.  I have Mr. Blair's mother,
19   Gail Blair, present and her friend, Tom; last name is
20   Hawthorne, Tom Hawthorne.
21             THE COURT:  Okay.  Good morning, folks.
22             All right.  We're here for Mr. Blair's sentencing.
23   The Court has reviewed the presentence investigation
24   report, the memos in aid of sentencing filed by both sides,
25   the body-worn camera footage of both the incident and
```

1    Mr. Blair's statements thereafter, the letters of support

2    from his coach, his father, and a family friend that were

3    submitted with the defense's sentencing memoranda as well as

4    the medical records that were submitted.

5            Anything else for the Court's -- anything else in

6    writing for the Court's consideration?

7            MR. LIEBMAN:  No, Your Honor.

8            MR. ROBERTS:  I have one thing, Your Honor.

9            THE COURT:  If you could.

10           MR. ROBERTS:  I have a letter, Your Honor, from

11   HSC -- Hamilton Site Construction -- which offers Mr. Blair

12   a job.  I'd like to tender that to the Court for the Court's

13   consideration.

14           THE COURT:  You can hand that up.

15           MR. ROBERTS:  (To Mr. Liebman) Do you have a copy

16   of it?

17           MR. LIEBMAN:  I'm not sure.  Thanks.

18           MR. ROBERTS:  Thank you, Your Honor.  That's it.

19           THE COURT:  All right.  Let's start with the

20   factual findings of the presentence investigation report.

21   Any objections that have not been resolved?  We'll get to

22   the calculation of the guidelines range in a minute.

23           MR. LIEBMAN:  No, Your Honor.

24           MR. ROBERTS:  I've filed objections, Your Honor,

25   based upon certain facts that we had some -- we thought were

1     inaccurate.  We put that in our objections.

2          THE COURT:  Okay.  Ms. Baker's here from

3     probation.  Have you reviewed the objections to the factual

4     findings, Ms. Baker?

5          THE PROBATION OFFICER:  Yes, Your Honor, I have

6     reviewed the objections that were filed in ECF regarding

7     Mr. Blair.

8          THE COURT:  Okay.  And were there any changes to

9     the draft presentence report based on those objections?

10         THE PROBATION OFFICER:  Just a minute, Your Honor.

11         (Pause)

12         THE PROBATION OFFICER:  No, Your Honor.  There

13    were objections, which the Court already addressed, to the

14    guideline calculations, and I believe in defense counsel's

15    memorandum that was recently filed he raised issues

16    regarding information in the mental health section of the

17    presentence report, which, of course, has not been changed

18    or modified.

19         THE COURT:  Okay.  Your objections are noted for

20    the record, but we will not further modify the final

21    presentence report.

22         All right.  Moving to the calculation of the

23    guidelines range, the defendant pled guilty to Count 2 of

24    the indictment charging interfering with a law enforcement

25    officer during a civil disorder in violation of 18 USC

1    Section 231(a)(3).   The statute carries a maximum sentence

2    of incarceration of five years, supervised release of one to

3    three years, a fine of $10 to $100,000, and a $100 special

4    assessment.

5         The probation office has calculated the advisory

6    guidelines range as follows:  Base offense level of 14 under

7    the assault guideline at Section 2A2.4.  That has been

8    enhanced by four points for use of a dangerous weapon under

9    the aggravated assault provision of that guideline, and the

10   defense objects to that.  The government joins in that

11   objection so why don't we hear from the defense on that.

12        Mr. Roberts.

13        MR. ROBERTS:  Yes, Your Honor.

14        The presentence investigation report has it right

15   in terms of picking the correct offense guideline.  She

16   chose 2A2.4, which is obstructing or impeding officers.

17        She then went down to the cross-reference and

18   applied the cross-reference, we assert, incorrectly.  She

19   found that the conduct constituted an aggravated assault.

20   It says, "If the conduct constitutes an aggravated assault,

21   apply Section 2A2.2."  She found that the conduct

22   constituted an aggravated assault, and that's what we have

23   strong objection to.

24        This, by the way, is not something that the

25   parties agreed to under the guidelines.  An aggravated

1    assault is defined under 2A2.2 in the notes.  It means a

2    felonious assault that involved, A, a dangerous weapon with

3    intent to cause bodily injury, not merely to frighten with

4    the weapon.

5              THE COURT:  Okay.  So let's stop there because

6    clearly it's Subsection A that either applies or not.  So

7    one, is a lacrosse stick a dangerous weapon in general; and

8    two, did the defendant intend to use it to cause bodily

9    injury as opposed to merely frightening?

10             MR. ROBERTS:  Right.

11             THE COURT:  Okay.  So let's start with is it a

12   dangerous weapon?

13             MR. ROBERTS:  Right.  And it's not a dangerous

14   weapon as defined under -- there's a definition.

15             THE COURT:  Right.  And the definition is whether

16   it's capable of inflicting serious bodily injury.

17             MR. ROBERTS:  Death or serious bodily injury.

18             THE COURT:  Right, so --

19             MR. ROBERTS:  So --

20             THE COURT:  You're telling me a lacrosse stick

21   can't cause serious bodily injury?

22             MR. ROBERTS:  I'm telling you the way it was used

23   in this case it certainly can't.

24             THE COURT:  That's not the question.  The question

25   is whether it is capable --

1              MR. ROBERTS:  Yes.  I would say it's not, Your

2      Honor.

3              THE COURT:  Let me finish.  A lacrosse stick is

4      incapable of causing serious bodily injury?  If somebody

5      whacks you over the head with it, they can't seriously

6      injure you?

7              MR. ROBERTS:  Yes, I would agree, if somebody

8      whacks somebody over the head.

9              THE COURT:  Just like a hockey stick or a field

10     hockey stick or a regular stick.

11             MR. ROBERTS:  Well, I think that you could take --

12     you can imagine almost any object, if you hit somebody over

13     the head with it, could be regarded as a dangerous weapon.

14             THE COURT:  Okay.

15             MR. ROBERTS:  But I would say we have to look here

16     at -- the question is whether or not --

17             THE COURT:  So let's go to the intent prong.  So

18     the question is, if I find that it is a dangerous weapon,

19     does the record before the Court indicate by a preponderance

20     that he intended to use that lacrosse stick to cause bodily

21     injury -- not serious bodily injury, just bodily injury --

22     as opposed to merely frightening the officer?

23             MR. ROBERTS:  Right.

24             THE COURT:  Tell me why.

25             MR. ROBERTS:  Because the use of the stick was --

1    it was pushed into the officer's center of mass, I'll call

2    it, the upper torso.

3              THE COURT:  He cross-checked him, right?

4              MR. ROBERTS:  Yes, exactly.

5              THE COURT:  All right.

6              MR. ROBERTS:  And that's how it's used in the

7    sport of lacrosse.  It's not known to cause injury used in

8    that fashion.  It didn't cause injury in this particular

9    case.

10             THE COURT:  The question is is it his intent,

11   not -- we can agree that it did not, thankfully.

12             MR. ROBERTS:  Right.

13             THE COURT:  So the question is one of intent.  So

14   what was he doing?  Why did he cross-check him, if not to

15   hurt him?

16             MR. ROBERTS:  Probably because he was provoked,

17   and I don't -- he had no intent to hurt the officer.  He had

18   no intent to hurt the officer because, if you want to --

19             THE COURT:  What was he intending to do?

20             MR. ROBERTS:  The intent was not to hurt him, and

21   here's why it wasn't.  If he wanted to hurt him, he'd hit

22   the officer over the head with it, or you would turn it, the

23   pointed end, and you would jab him with it in a vulnerable

24   area, the head, you know, the lower body, whatever it is.

25             He didn't do it that way.  He did it like a cross-

1    check.

2              So the way it was used was not going to cause

3    bodily injury, and I think so from the circumstances we

4    can't say he intended to cause bodily injury.  That's why.

5              THE COURT:  Okay.

6              MR. ROBERTS:  I mean, the only thing that the

7    presentence investigator drew the attention to to support

8    her belief that he intended to cause injury was that he used

9    some expletives and apparently was mad at the officer.  I

10   got it.  But that doesn't prove that he intended to cause

11   bodily injury.

12             THE COURT:  Well, he was not merely -- he did not

13   intend merely to frighten him, as the note says.  It

14   distinguishes intent to injure versus intent simply to

15   frighten.

16             MR. ROBERTS:  Well, I think you have to go back to

17   the --

18             THE COURT:  It was more than to scare him, right?

19             MR. ROBERTS:  I don't know, Your Honor.  All I can

20   say is that watching the videotape it's clear that he is

21   pushing the officer.  The officer pushed him, we know.  And

22   the officers, if you watch the body tape, are going through

23   and clearing, and they will push people with their batons.

24   No one's claiming that the officers are causing bodily

25   injury or intended to cause bodily injury by using their

1    batons.

2              This is the same thing.  This is pretty much the

3    same thing.  He just pushed back.  I don't believe fairly

4    that we can say that was the intent, to cause bodily injury.

5              But I go back to the point that the dangerous

6    weapon, as defined, is something that's capable of

7    inflicting death or serious bodily injury, so when we're

8    talking about using the stick in this fashion, we're not

9    talking about intending to inflict serious bodily injury.

10             If he took the stick, granted, and hit the officer

11   over the head or took the sharp end of it and poked the

12   officer with it, jabbed him with it, that would be a whole

13   different matter.

14             THE COURT:  Okay.

15             MR. ROBERTS:  So that's why we say this is not --

16   does not fall in that category.  I think that it's very

17   strong to say that -- when the prosecutor files an objection

18   to the report on the same basis that we're alleging right

19   here now, that's pretty strong evidence, I believe, of

20   what -- of the fact that the government did not believe this

21   constituted --

22             THE COURT:  That's a good segue for me to hear

23   from Mr. Liebman on that.

24             MR. ROBERTS:  Okay.

25             MR. LIEBMAN:  Thank you, Your Honor.

1          THE COURT:  So, Mr. Liebman, I was frankly pretty

2     surprised by the concession given that the grand jury

3     originally charged the defendant with assaulting a police

4     officer with a dangerous weapon.

5          MR. LIEBMAN:  Well, as it turns out, that

6     concession was ill-advised because we actually filed a new

7     corrected objection letter regarding the PSR report on June

8     30th.  It's not our practice to file these on the public

9     record, but the defense sentencing memo actually discusses

10    the fact that we changed our position regarding the

11    guidelines calculation, and we actually agree -- and I sent

12    a letter to both, a new letter both to the defense and to

13    Ms. Baker.  We actually agree with the sentencing guideline

14    calculation as calculated by the probation office.

15          But let me just say right away, Your Honor --

16          THE COURT:  So now I'm really confused.

17          MR. LIEBMAN:  Yes, and I don't fault you at all.

18          At the time we drafted the plea agreement, which,

19    by the way, was reviewed by the several levels within our

20    office, we actually -- that's what we thought were the

21    proper guidelines calculations.  I was informed late last

22    month that that is not our position and should not have been

23    drafted in that fashion.

24          Now, the plea agreement technically gives us the

25    option of arguing for a higher guideline calculation and a

1    higher corresponding sentence than the guidelines as

2    calculated in the plea agreement.  I think the language is

3    pretty clear, but I should emphasize we are not doing that.

4    We are only advocating for a sentence at the low end,

5    actually, of the lower range as contemplated by the plea

6    agreement.

7              That being said, because we, the government, have

8    to try to be consistent, when we can as much as possible,

9    throughout all these cases involving the Capitol riot and

10   maybe even other cases frankly, we are endorsing the

11   guidelines as calculated by the probation officer in the

12   report.

13             THE COURT:  Okay.  The Court will make the

14   following findings.

15             MR. ROBERTS:  Your Honor --

16             THE COURT:  I've heard argument, Mr. Roberts.

17             The Court agrees with the probation office's

18   addition of the four-point enhancement for aggravated

19   assault.  It is clear to me that a lacrosse stick is capable

20   of causing serious bodily injury.  The evidence also

21   suggests that Mr. Blair used it not with the intent just to

22   frighten the officer but to cause at least some bodily

23   injury by, as he acknowledges, cross-checking the officer

24   with the lacrosse stick.

25             Now, that said, it was not the most serious

1    assault in the world, and that is a variance issue.  But I

2    think, as the guidelines are written, that enhancement

3    applies in my view because the -- you know, he meant to

4    cause at least some bodily injury given his aggressive

5    posture and what he did with the stick.

6              But, Mr. Roberts, we can deal with the conduct in

7    terms of a variance from the guidelines range.

8              Moving beyond that, the probation officer applied

9    a three-point reduction for acceptance of responsibility and

10   prompt plea, bringing the total offense level to 15.  The

11   defendant has no criminal history so is at Criminal History

12   Category 1.  Level 15 at Criminal History 1 equates to an

13   18- to 24-month advisory guidelines sentence.

14             In addition to that, I generally give the

15   defendant the benefit of the offense level calculated in the

16   plea agreement, and so we'll do so here as my starting

17   point.  I will start with the 8-to-14 guideline range, but I

18   think technically the 18- to 24-month range applies, and so

19   that's what the Court will calculate the guidelines range

20   as.

21             Pursuant to the plea agreement, the defendant has

22   also agreed to pay restitution in the amount of $2,000 to

23   the Architect of the Capitol as well as a $100 special

24   assessment.

25             Any other objections for the record that have not

1    already been noted?

2              MR. ROBERTS:  And I didn't mean to interrupt, Your

3    Honor.  I didn't mean to interrupt.  But I did want to

4    preserve for the record --

5              THE COURT:  It's been preserved.

6              MR. ROBERTS:  Right, but my objection that I

7    haven't put yet on to you is that this -- the fact that the

8    prosecution endorses the presentence investigation's

9    calculation of this sentencing range violates the plea

10   agreement.  We hammered this out carefully back and forth,

11   and now for them to say at sentencing they endorse the

12   presentence investigator's calculation of the guidelines

13   sentence range we have strong objection to.

14             That's not -- we didn't bargain for that when we

15   entered the plea.  We didn't bargain that when we got to the

16   sentencing the prosecutor would be able to endorse the

17   presentence investigator's calculation, which it did not

18   agree with when we entered into this agreement.

19             THE COURT:  Okay.  Very well.  Your objection's

20   noted.

21             As you know, Mr. Roberts, the Court has an

22   independent obligation to calculate the guidelines range --

23             MR. ROBERTS:  We do know that.

24             THE COURT:  -- notwithstanding what the parties

25   have agreed to in the plea.

```
 1              MR. ROBERTS:  We know that.

 2              THE COURT:  And that is the range for the purposes

 3     of sentencing, okay?

 4              All right.  The probation office has recommended a

 5     sentence of 12 months and one day, 18 months of supervised

 6     release, and no additional fine.  The government's

 7     recommendation is eight months -- which is at the low end of

 8     the range negotiated or estimated in the plea -- three years

 9     of supervised release, and the agreed $2,000 restitution

10     figure.

11              Mr. Liebman, would you like to address the

12     sentencing factors.

13              MR. LIEBMAN:  Yes, Your Honor.  Thank you.

14              And I don't mean to beat a dead horse, Your Honor,

15     but we interpret the plea agreement as allowing for the

16     government to advise the Court that we agree with the

17     sentencing guidelines.  Mr. Roberts wrote a sentencing memo.

18     He didn't accuse us in there of violating the plea

19     agreement, but he has here today verbally, so I'll just

20     reiterate that.  We don't believe it's a violation of the

21     plea agreement.

22              That being said, Your Honor -- and the Court may

23     have noticed from the government's filings that the

24     government did go back and forth a little bit about whether

25     or not to give the benefit of the Zone B section of the
```

1   sentencing guidelines.  That, under the sentencing range as

2   calculated in the plea agreement at least, would allow the

3   Court to split the sentence in some fashion such that some

4   of it, and theoretically possibly all of it, is satisfied by

5   home confinement up to the low end of the sentencing -- of

6   the range.

7           After some thought, our position is that the Court

8   should not use that provision and should sentence the

9   defendant to straight prison time of eight months, the low

10  end of the prison term as calculated under the plea

11  agreement.  And the reason for that, Your Honor, is that

12  notwithstanding this defendant's lack of a criminal history,

13  and notwithstanding that he didn't himself hurt individuals

14  or damage property, we have here a defendant who, in the

15  months leading up to the riot, by his own admission became

16  radicalized over the Internet in a very, very dangerous

17  fashion.

18          The defendant deserves some credit, frankly, for

19  acknowledging and admitting that, but nonetheless, it should

20  be recognized by this Court.  And, as I said -- as he said

21  and as I said in the sentencing memo, he became -- had

22  Internet contact with an individual who was advocating

23  incredibly dangerous and frankly -- you know, dangerous and

24  troubling anti-Semitic positions, okay.

25          THE COURT:  So I noticed that in your memo.

1    Oftentimes I will get text exchanges or Internet exchanges

2    or some additional flavor of those communications, but I

3    didn't see any of that.

4            MR. LIEBMAN:  We don't have the actual

5    communications, Your Honor.

6            THE COURT:  Okay.  So how do you know the tenor of

7    the radicalization as you --

8            MR. LIEBMAN:  Based on his own discussions, his

9    own admissions and acknowledgements to law enforcement.

10           THE COURT:  Okay.

11           MR. LIEBMAN:  And they included beliefs that he

12   characterized as bankers control the country, bankers

13   control the world, and specific anti-Semitic beliefs.

14           During this period he also bought an AR-15 rifle,

15   which he had in his home.  Yes, it was purchased legally,

16   but certainly it's troubling that he would do that in the

17   midst of this radicalization and, by the way, living -- he

18   resided with his mother in a fairly modest home who had no

19   idea that he had done that, had purchased that weapon as

20   well as ammunition for that weapon.

21           And then on January 6th, he goes down to the

22   Capitol.

23           THE COURT:  And why did he go?

24           MR. LIEBMAN:  That's a good question, Your Honor.

25   It's not quite clear to us.

1          We know he did say he wanted to fight Antifa, but

2     it's not quite clear why he would choose to do that on

3     January 6th and look for -- apparently look for Antifa

4     individuals to fight at the Capitol because January 6th was

5     not a day that Antifa had advertised that they were going to

6     attack the Capitol.  It was a day that was the -- Congress

7     was certifying the election results, of course, and that the

8     Internet was filled with people who intended to rally on the

9     Ellipse and potentially march to the Capitol.

10          We don't know for sure if the defendant saw those

11     Internet postings, but that's where he went, and, in fact,

12     he makes a point of saying it took him about an hour from

13     where he parked to walk to the Capitol.

14          THE COURT:  All right.  So is it a fair inference

15     that if someone gets in their car at 3:15 or 3:30 on January

16     6th and drives to the Ellipse or to the Mall, that they know

17     that -- that they know what's going on before they get in

18     the car?

19          MR. LIEBMAN:  I would agree -- yes, Your Honor, I

20     think it is, especially if, after they parked the car, they

21     proceed to walk an hour in order to get to the Capitol

22     building.

23          And he didn't just go there, you know, to protest,

24     I would submit, Your Honor.  He went there in a very

25     provocative manner.  He had a gaiter around his neck that he

1    pulled up halfway over his mouth, over his face, that had a

2    skull insignia, and he would later write in a notebook that

3    was found in the search warrant that he needed -- he was

4    justifying this in some fashion to, quote, save, end quote,

5    the country.

6            And he carried a flag, but not like the numerous

7    other rioters who came to the Capitol that day, almost all

8    of whom who were carrying flags were carrying a U.S. flag.

9    He carried a Confederate battle flag.

10           I know the defense, in their memo, makes the point

11   that the defendant's beliefs shouldn't factor into this

12   Court's assessment.  He has a First Amendment right to them

13   however -- I guess however offensive they might be, but the

14   government's point is that by carrying that flag and wearing

15   that provocative mask he is looking for a fight.  He is

16   looking to provoke violence, and that's, frankly, consistent

17   with what he said was his purpose, to go down there and

18   fight Antifa.

19           Now, even if maybe that was his initial purpose,

20   he didn't find Antifa at the Capitol -- on the Capitol

21   grounds.  He found fellow travelers who felt the same way as

22   he apparently did about what was going on inside the

23   Capitol, and he found police officers, and it was police

24   officers who he challenged and defied and refused to comply

25   with lawful demands.

1            Now, I know the Court has said it reviewed the

2    body-worn camera footage.  I would nonetheless like to play

3    a small portion of that body-worn camera footage right now

4    because there are some disputes, based on my discussions

5    with counsel and what's in the memo, as to what is actually

6    being depicted, if I may?

7            I'm going to have to do that from the desk.  I'm

8    going to pause it periodically.

9            This will be Government's Exhibit 1.

10           (Video playing)

11           MR. LIEBMAN:  So I'll just pause it there.  We're

12   one second into the file.

13           So this is the body-worn camera of Officer KP, the

14   named assault complainant in the indictment.  This is on the

15   West Lawn on the Capitol.  The date is in the upper right,

16   January 6th at 17:46 and 23 seconds or 5:46 p.m. eastern

17   time.  The defendant is not in the frame right now.  We're

18   looking west, Your Honor, away from the Capitol.

19           MR. ROBERTS:  Excuse me, we don't have it on our

20   screen here.

21           THE COURT:  Hold on.  We'll work it out.

22           (Pause)

23           MR. LIEBMAN:  Okay.  Resuming playing now.

24           (Video playing)

25           MR. LIEBMAN:  I'll just pause it there at ten

1    seconds into the file.

2              Roughly in the center of the frame a little bit

3    below midpoint is the Confederate battle flag that the

4    defendant is carrying.

5              (Video playing)

6              MR. LIEBMAN:  All right.  So that's the defendant,

7    Your Honor.  I'll pause here at 43 seconds.  That's the

8    defendant who just said "quit backing up, quit backing up"

9    right in the lower part of the frame a little to the right

10   in the foreground.

11             What's interesting about this, Your Honor, is all

12   the other rioters are actually at this point complying with

13   police demands, at least the ones we can see in this image

14   in this area.  He is the only one who is not.  And not only

15   is he not complying, he is urging others also not to comply.

16             (Video playing)

17             MR. LIEBMAN:  Now, I pause it here now at 58

18   seconds because this is a point of contention between the

19   parties, Your Honor.

20             So as you notice here, the defendant has now

21   positioned himself roughly with his back to the officer

22   whose body-worn camera we're looking at and rotated slightly

23   to his -- the defendant's left.  The government submits that

24   what's going on here, Your Honor, is the defendant is

25   seeking to provoke a physical confrontation.  He has

1      positioned himself getting closer to the officer, this

2      particular officer, while other rioters were moving in the

3      other direction in order to draw contact, intentionally, and

4      that's what's about to happen on the defendant's left

5      shoulder with the officer's baton.

6                  (Video playing)

7                  MR. LIEBMAN:  Right there.  That's at 59 seconds.

8      Resuming playing.

9                  (Video playing)

10                 MR. LIEBMAN:  So that was the assent -- that right

11     there, what we just witnessed, those two seconds, was the

12     crux of what the officer physically did to this defendant.

13     It was a push with the baton in a professional manner

14     holding it laterally on a nonsensitive part of the

15     defendant's body that didn't even knock him down.

16                 THE COURT:  But I've reviewed other footage from

17     other officers, and it seems like this officer's contact was

18     part of the line deciding to move forward as a line to push

19     everyone back.

20                 MR. LIEBMAN:  Yes.  That's an excellent point,

21     Your Honor.  As Your Honor was demonstrating, the officers

22     were doing so pursuant to their training, holding their

23     batons laterally at about chest height, one hand on each

24     end, and thrusting forward in a way designed not to cause

25     any bodily injury to the person they might make contact

1    with.

2              In fact, this particular officer, in the earlier

3    part of this very same body-worn camera file that I haven't

4    played, he actually knocks down another rioter in that

5    fashion.  That rioter actually falls to the ground, unlike

6    the defendant.  The rioter gets up, a little annoyed,

7    continues moving -- but resumes moving in the other

8    direction away from the Capitol, away from the police,

9    complying with their demands.

10             This defendant, not even knocked over, stands up,

11   turns around, and then confronts the officer verbally.

12             (Video playing)

13             MR. LIEBMAN:  And right there we have the

14   assaultive conduct that was the basis of the assault charge

15   in the indictment.

16             Agreed, the defendant is thrusting his lacrosse

17   stick laterally toward the officer and challenging him.

18             (Video playing)

19             MR. LIEBMAN:  The confrontation is over, and

20   granted, as we acknowledge, the defendant did suffer bodily

21   injury as a result of that, required hospitalization.  He

22   was there overnight.  But, again, no one else around him --

23   rioters, that is -- are defying the police the way he is.

24   He appears to be the only one.  And, again, he encouraged

25   others to do the same.

1          Now, the government readily acknowledges that

2     after he was detained and, yes, after he did suffer injury,

3     he became remorseful.  He became cooperative.  That is to

4     his credit, and it's for those reasons, Your Honor, which we

5     acknowledge in our sentencing memo -- and it is reflected in

6     the plea agreement that was signed -- that we are only

7     asking for the low end of the guideline range of

8     imprisonment as calculated in the plea agreement, eight

9     months.

10          We do believe, Your Honor, though, that a sentence

11     structured in a way that allows for some of that time to be

12     through home confinement or community confinement would not

13     address the seriousness of the defendant's conduct leading

14     up to and including the attack on the officer.  Home

15     confinement, frankly, for a defendant who has lived at home

16     regularly prior to the riot, is not much of a punishment at

17     all.

18          THE COURT:  But if I have calculated the range

19     outside of Zone B, I don't have authority to do that anyway;

20     is that right?

21          MR. LIEBMAN:  Correct, unless the Court issues --

22     finds a need for a variance, I suppose.  But if we're

23     looking at the plea -- the calculation as covered by the

24     plea agreement as contemplated there, Your Honor, Zone B

25     would apply if that were in the guideline range.  But we

1    don't believe it's appropriate to structure the sentence in

2    that fashion, and I have tried to compare, in my sentencing

3    memo, this case to other defendants who pled guilty.

4           We only have guilty pleas to Section 231

5    violations only involving the Capitol riot.  I believe he's

6    more serious than one defendant I describe in there, another

7    case, and less serious in another, and I'm asking for him to

8    be basically pigeon-holed between the sentences imposed in

9    those cases.

10          THE COURT:  The more serious one is Nolan Cooke,

11   and the less serious one is Daniel Johnson, in your view?

12          MR. LIEBMAN:  Yes, Your Honor.  Yes, Your Honor.

13          But the government would emphasize that it does

14   recognize the defendant's remorse.  He cooperated after --

15   immediately after his arrest.  A knife was recovered, a

16   four-inch knife that was one of the bases for the charges.

17   It was recovered inside his backpack.  That's troubling, but

18   he readily acknowledged that it was there.  He did not take

19   it out at any point that we know of at least while he was on

20   the Capitol grounds.

21          And for all those reasons, Your Honor, a sentence

22   of eight months imprisonment followed by three years of

23   supervised release we believe is appropriate here.

24          THE COURT:  Very well.  Thank you.

25          Mr. Roberts.

1        MR. ROBERTS:  I guess another thing I should right

2    at the outset take exception to is the government's change

3    in its position again.

4        In the sentencing memorandum they filed, the

5    corrected sentencing memorandum, on Page 14 it said applying

6    the 3553(a) factors supports the imposition of a three-month

7    period of imprisonment followed by supervised release that

8    includes a condition of a five-month period of home

9    confinement.  Now it's changed its position here today to

10   say it wants a full eight months.

11       First of all, with regard to the anti-Semitic

12   remarks, I believe that Mr. Liebman's taking that from an

13   FBI -- the FBI interviewed my client.  He gave a full

14   interview to them, and he discussed the fact that they asked

15   him who have you been talking to.  He said he played video

16   games with some fellow from Canada, and it was his

17   grandfather who was -- who had made these remarks about

18   these an -- these anti-Semitic remarks.

19       Now, to assert that this young man is anti-

20   Semitic, I think, is just wrong.  First of all, Mr. Gash,

21   the coach, if you look at his statement, he's Jewish.  He

22   makes a point of saying he's Jewish in his statement.  He

23   knows this young man very well.  Not only was he his coach,

24   he regards him as a friend.  He hired him on three jobs.  I

25   think if Mr. Blair was anti-Semitic, that should be readily

1    apparent to Mr. Gash.

2         The other thing about the gun.  I don't know where

3    this comes from, that the mother didn't know that the gun

4    was there.  The mother tells me nobody asked her about that,

5    and, you know, she knew the gun was there.  Apparently she

6    shot the gun before.  So I don't know where it's coming from

7    that the mother didn't know that her son had the gun, but no

8    matter -- no matter -- the gun was legally possessed.  It

9    wasn't even taken by the FBI during the search.

10         So those are points I want to make at the outset.

11         Look, Your Honor, I think that the important thing

12   here is that Mr. Blair did not plead to assault.  That was

13   something Mr. Blair refused to do.  So now he's really being

14   tagged with committing an assault here, and that's -- it's a

15   question of context.

16         We disagree with Mr. Liebman's view that what

17   David did was intentionally draw the officer to hit him on

18   his left shoulder while his back was turned or his head was

19   turned.  We disagree with that completely.  You can see --

20   if you watch the other videos that we have submitted to you

21   in Exhibit 5, the YouTube videos I think best show that he

22   was exhorting the people behind him, and he's basically got

23   his attention drawn there.

24         I'm not denying that he didn't know that the line

25   is going to be moving, but what I do assert is that when the

1   officer makes contact with him, if you watch the --

2   particularly the YouTube videos, you can see that he's not

3   really seeing that one coming.  And when it comes, it jars

4   him, and that's what, as he said later to the police,

5   flipped the switch.  And it flipped the switch, and that's

6   when he decided to do what he did.

7          He apologizes for that conduct.  He's embarrassed

8   by that contact.  He's embarrassed that he lost his

9   emotions, but, again, the context is important here.

10          I heard your colloquy with Mr. Liebman about well,

11   shouldn't he have known what was going on?  Well, actually,

12   he's 26 years old.  Some of these young people, you'd be

13   surprised what they don't know, and he ran -- he took a run

14   that afternoon, decided to come down, and he did not know --

15   he knew that there were people at the Capitol, but he didn't

16   know that there was a breach of the Capitol.

17          And why do we know that?  Because that very night

18   that's what he told the officers.  That's in my memorandum

19   where I listened to these body-worn cameras.  He tells them

20   I didn't know that there had been a breach.  He was

21   surprised to learn that, that anybody could have gotten in.

22          And later, Sergeant Fabian, when they were getting

23   ready to transport him to the hospital, asked him again.  He

24   said, "I didn't know.  I just didn't know."

25          Is that possible?  Yes.  It's possible.

1          THE COURT:  So the notion just occurred to him at

2    3:00 on that Tuesday, or whatever day it was, to get in his

3    car and go down to the Capitol?

4          MR. ROBERTS:  You're saying the notion that there

5    had been a breach?

6          THE COURT:  That there are just a few people down

7    on the Capitol, and maybe I'll join them.

8          MR. ROBERTS:  I'm not denying that.  I'm just

9    saying that he didn't know that the breach had occurred.

10          THE COURT:  He didn't turn on Fox News or CNN or

11    NBC --

12          MR. ROBERTS:  Listening to music.  Listening to

13    music.

14          THE COURT:  -- at 3:30 to see what was going on,

15    and then get in his car to ride down there?

16          MR. ROBERTS:  He watched some streaming before he

17    left.

18          THE COURT:  Uh-huh.

19          MR. ROBERTS:  It's a long drive down here, and so

20    he's listening to music on the way down.  He gets here.  He

21    does not know that there has been a breach.  He told the

22    officers that several times.  And the young man is not --

23    he's not the kind of guy that's lying to the police.  I

24    mean, these are uncounseled statements.

25          So he really didn't know that there was a breach.

1    As hard as it seems, I think that's -- I'm not surprised by

2    that, and he actually confirms it, corroborates it, by

3    that's what he tells the officers in the body-worn cameras.

4    You can see it.  It's right there.

5              THE COURT:  All right.  So you say that between

6    3:00 and 3:15, when he left his house --

7              MR. ROBERTS:  Yes.

8              THE COURT:  -- he hadn't turned on the television

9    or looked on YouTube to see --

10             MR. ROBERTS:  Oh, he had --

11             THE COURT:  And what do you think he saw?

12             MR. ROBERTS:  There were certainly --

13             THE COURT:  Peaceful protesters?

14             MR. ROBERTS:  He thought there was a gathering at

15   the Capitol.  He knew that much.  He thought it would come

16   down --

17             THE COURT:  What sort of gathering?

18             MR. ROBERTS:  Well, President Trump had given his

19   speech.  A lot of people came.  I guess they were going to

20   be protesting the election and that kind of thing.  He just

21   didn't know that there was a breach, that people had gotten

22   in.

23             THE COURT:  Mr. Liebman, remind us when the first

24   breach occurred and was televised live?

25             MR. LIEBMAN:  2:20 p.m. the building itself was

1    breached, Your Honor.

2              THE COURT:  Thank you.

3              MR. ROBERTS:  What time, sir?

4              MR. LIEBMAN:  2:20 p.m.

5              THE COURT:  2:20.

6              MR. ROBERTS:  I mean, that's one thing.  And

7    that's an important thing.

8              The other thing, Your Honor, is that he arrives on

9    the West Lawn ten minutes before he gets arrested.  He parks

10   on L Street.  It takes him a while to walk from L Street all

11   the way there.  He walks right across past P Circle.

12   Somebody was addressing the crowd there at P Circle.  He

13   listens for just about 30 seconds and then moved up onto the

14   West Lawn.

15             There are no -- and I've taken a lot of pains to

16   show in our affidavits that by that time there were no signs

17   or barriers to tell anybody that you can't be on the West

18   Lawn.  There was already a lot of people on the West Lawn.

19   There are not as many people as there were three hours

20   earlier.  That place was nothing but packed with people.

21             But when he gets there, there's no barriers or

22   signs that tell him, hey, you're not supposed to be on this

23   property, so he has no idea that he's not supposed to be

24   there.

25             So all that's to say this.  He thought that he had

1   a right to be where he was.  It tends to explain a little

2   bit why he's taking this position that, hey, we don't have

3   to move.  We have a First Amendment right here.  That's what

4   his belief was at the time.

5          And if you listen to the other body-worn camera,

6   there are other people who are being moved back and saying,

7   "Hey, don't we have a right to be here?"  So that's what's

8   in this young man's head, and that's why he's saying -- he's

9   taking the position, look, I want to protest.  I have a

10  right to be here.

11          Now, they're moving people off, and that's what it

12  is.  And if he resists that, the officers, in a First

13  Amendment assembly situation, are supposed to do something

14  more than just use immediate force.  There's supposed to be

15  a dispersal order from multiple locations by bullhorns

16  telling people that you have to leave, you're going to be

17  arrested, and here's where you should go to to leave.

18  That's what's supposed to be in a dispersal order.

19          There was a dispersal order being sounded at the

20  Capitol.  I could hear it when they were bringing my client

21  up to the Capitol after they had arrested him, but you

22  couldn't hear it down where he was.  Remember now, he is

23  about 100 feet from P Circle.  He's about as far west on the

24  West Lawn as you can be.

25          So he did not have the benefit of hearing that

1    order.  All he sees is officers coming along saying move

2    back; not go to, you know, First Street over here, or that

3    you're going to be arrested.  It's just move back, move

4    back.  And so he made the decision to say, look, we don't

5    have to move back further.

6            Now, some protesters might take that position, and

7    what do you do with them?  According -- there's a statute on

8    this.  It says exactly what they're supposed to do.  The

9    police officer is supposed to use voluntary measures to

10   encourage compliance.  Warn them, use persuasion, whatever

11   you want to -- those kinds of things.  That didn't happen.

12           And what would have happened had they done that?

13   I think if someone had explained to him, "Look, son, there's

14   just been a riot up here.  We've got to move people off.

15   Now, listen to me.  If you don't move, I'm going to arrest

16   you."  And if he doesn't move, arrest him.

17           But this -- there was the shove that really set

18   this young man off and led to the unfortunate events that

19   we're here for today because if he moves, there's not going

20   to be any problem.  That's the obstruction.  That's the

21   obstruction.  That's what he's pled to.

22           So I'm only asking the Court to consider all those

23   facts; that he was there in a belief that he was a

24   protester, and he thought he had a right to be there.

25           Now, you have to look at the seriousness of this,

1     the seriousness of this offense.  He is right there within

2     100 feet or less of the place where the officers are moving

3     back.  They are to basically climb that little wall there on

4     First Street.  That's 100 feet away.  And as you can see,

5     Peralta, the officer, the other officers, just left him

6     there.  He was arrested, and they moved on, and they were

7     there in like, what, five to ten seconds.  So he's that

8     close to be in the place where he's to leave.

9            Did it affect anything?  I can't see that it did,

10    but that's why I think, in measuring the seriousness of the

11    offense, you have to look at did he really impede or prevent

12    them from getting people off the lawn.

13           No real -- not much, I should say, emphasis is

14    placed on the injuries that this young man received.  I

15    mean, I don't think anybody -- I haven't heard from the

16    government that they endorse the injuries because they

17    can't.  You are not allowed to swing a baton and strike

18    someone in the head with it, and that's what happened,

19    according to the investigation, three times.  And it was all

20    by the officer, Peralta, who did that, and it created pretty

21    severe gashes in the head and gave him a concussion, and for

22    a couple of weeks he had some pretty severe symptoms

23    associated with that.  And since that time, he's gotten

24    better, but he has migraine headaches every so often about.

25           THE COURT:  I mean, I took note of that.  What am

1    I supposed to do with that?  Is that a mitigating factor?  I

2    mean, obviously if there's -- if excessive force was used

3    under the circumstances, you could seek a remedy for that.

4              MR. ROBERTS:  Sure.  There's a remedy.

5              THE COURT:  Yes.

6              MR. ROBERTS:  But I think it should take into

7    account what the sentence -- what your sentence should be.

8              THE COURT:  A little rough justice.

9              MR. ROBERTS:  Sorry?

10             THE COURT:  Rough justice.

11             MR. ROBERTS:  Yes, it's a little bit of rough

12   justice, right, which is strictly prohibited, so I do think,

13   though --

14             THE COURT:  Not what the police did, but I should

15   take it into account in assessing the overall --

16             MR. ROBERTS:  Overall sentence to be used,

17   imposed.

18             THE COURT:  Okay.

19             MR. ROBERTS:  Mr. Liebman has correctly pointed

20   out the remorse and the cooperation.  I think those are very

21   strong factors, Your Honor, I mean, because it tells you

22   about the nature of the individual you're working with here,

23   you're dealing with.

24             You're not dealing with someone who is prone to

25   commit criminal conduct.  He was 26 at the time.  He's 27

1    now.  Never been arrested in his life before so -- and the

2    fact that he manned up and admitted to the police and

3    apologized to them within minutes and did it more than once.

4           That he accepted the responsibility for his

5    actions and he apologized I think says -- speaks a lot for

6    this young man.  It tells you how he was raised, what kind

7    of person he is, and, you know, as some of the letters

8    indicate, the mother indicates, this is a young man who

9    cares about his neighbors, cares about his family, has done

10   a lot for them.  He's done some wonderful things for people,

11   and that's the kind of person he is.

12          This is not a typical -- this is not something

13   that's typical for him.  He felt strongly about his family

14   heritage and what was going on in 2020.  He felt very

15   strongly about that, and probably --

16          THE COURT:  And that's why he brought a

17   Confederate flag to the Capitol?

18          MR. ROBERTS:  Well, I think he brought a

19   Confederate --

20          THE COURT:  This wasn't a protest over the removal

21   of Confederate monuments, was it?  It was about the

22   election.  What does a Confederate flag have to do with the

23   election?

24          MR. ROBERTS:  Well, I think he wasn't -- honestly,

25   and he told the FBI this, he wasn't there for the election.

1          THE COURT:  He was there to, you said, hear -- he

2     knew that Donald Trump had given a speech, right?

3          MR. ROBERTS:  I think he was there -- as he says,

4     he was there because he was bothered by what had happened in

5     2020.  He was there -- part of it was the removal of

6     Confederate statues, which his -- on his mother's side, they

7     had some people who fought in the Confederate Army.  One of

8     these people, as I pointed out in my memo, was this Wade

9     Hampton III whose statue was in the Capitol, and so that was

10    taken away.

11         So I think he brought it because he knew also, and

12    he said this to the FBI agent, look, that Antifa's been --

13    "They use some communist symbolism.  Why should it bother

14    anybody if I have a Confederate flag?"

15         It doesn't really express his views about race,

16    for example.  He indicated that many of his friends -- he

17    said most of his friends were Black, and so I don't think it

18    expresses his real views about how he views people of other

19    races because he does have Black friends, many of them.

20         So, I mean, but all that considered, Your Honor,

21    I've asked for a sentence of probation for him, and the

22    guidelines say, if we're looking at an 8- to 14-month range,

23    which is what I think we're all agreed we're doing, that

24    puts him in Zone B, and in Zone B, because he is a first

25    offender, that means he meets the criteria under 997(j), 28

1    USC 997(j), which is in my memorandum.  He's entitled to be

2    treated as a first offender.

3           What does that mean?  It means that the preferred

4    sentence for a first offender is probation.  The Court can

5    couple probation under the B section of the guidelines with

6    conditions of confinement, and I think that -- if the Court

7    is not going to just give him probation, they could do that.

8           I mean, I was sort of heartened at the time when

9    the government filed its sentencing memo that it indicated

10   three months of imprisonment and then five months home

11   detention.  Now they changed that position, but that's what

12   it said.  And I think that a period of eight months where

13   he's allowed to be in home confinement or he's allowed some

14   other intermittent confinement or community confinement

15   would be appropriate -- the appropriate sentence here in

16   this particular case.

17          So that's the sentence that we urge that you give

18   because I think, when you look at this whole thing, the

19   salient facts to remember are he is not in the Capitol.

20   He's not even close to the Capitol, and he's not even there

21   at a time when the breach occurred.  In fact, as we've put

22   in our memo, by the time he arrives the chambers in the

23   Capitol are -- have been secured.

24          So, I mean, this is about as remote as it gets on

25   a January 6th case, I think, in terms of actual seriousness.

1    This is really on the fringe, and I ask that that be taken

2    into consideration in imposing the kind of sentence we're

3    asking for.

4              THE COURT:  Very well.

5              Mr. Blair, anything you'd like to tell me before I

6    pronounce your sentence?

7              Step right up.  Good morning.

8              THE DEFENDANT:  Good morning, Your Honor.  Thank

9    you.

10             You know, I'm not up here to make any excuses for

11   my actions.  For the first time in my life in a very public

12   setting I allowed my emotions to dictate my actions.  I

13   was -- I was raised better than that.  I know better than

14   that.  I accepted responsibility immediately.  That was not

15   maybe a wise thing to do legally when you're facing trial,

16   but, you know, it's how I was raised to act.

17             You know, as Mr. Roberts addressed, two weeks

18   prior to January 6th they voted to remove one of my

19   ancestors out of the Capitol.  It upset me.  I'm tired of

20   our history being erased in our country.  I understand that,

21   you know, it's a touchy subject for people, but, you know,

22   at that point in time it upset me.  That's why I went down

23   there.

24             You know, I would do anything --

25             THE COURT:  What went through your mind at 3:00 in

1    the afternoon when you got in your car to drive down there?

2    You knew what was going on, right?

3              THE DEFENDANT:  Well, I was watching a stream

4    until about I'd say 1:40 or 1:50, and at that point people

5    had surrounded the building, but they had not --

6              THE COURT:  So you knew it was a riot.  You knew

7    that there was --

8              THE DEFENDANT:  Well, there wasn't any violence

9    going on.  When I saw a couple of flash bangs get thrown,

10   the people didn't really react violently to it.  You know,

11   obviously, there -- I had saw there was what was I guess

12   bike racks on the concrete of the Capitol much closer to the

13   Capitol.  Those hadn't been breached at that point.

14             You know, I went on a run, took my dog for a walk,

15   took a shower, and decided to drive down there.  You know,

16   in the morning, I thought about going down there, and I

17   didn't.  And when I saw everybody down there --

18             THE COURT:  You knew that there was a Stop the

19   Steal rally, that there was a protest about the election,

20   that the election had been stolen.  You knew all that,

21   right?

22             THE DEFENDANT:  Right, right, I didn't know what

23   was real about the election --

24             THE COURT:  Okay.

25             THE DEFENDANT:  -- to be honest with you.  I

1    didn't know what the reality was, and -- but what I did know

2    was that I was upset about what I felt like was American

3    history being erased all throughout 2020.

4              And it wasn't just Confederate monuments, Your

5    Honor.  You know, it was our founders at some points.  So,

6    you know, it just -- it bothered me --

7              THE COURT:  But the rally didn't have anything to

8    do with Confederate history or removal of monuments or your

9    ancestors.  The rally --

10             THE DEFENDANT:  No --

11             THE COURT:  Let me finish.  The rally was about

12   the election, and some folks felt very strongly about that,

13   and that's fine.

14             But it wasn't about Confederate history.

15             THE DEFENDANT:  No, I understand that.

16             THE COURT:  All right.  And so tell me again why

17   you decided to bring a Confederate flag and a knife to the

18   rally about the election.

19             THE DEFENDANT:  Well, as I mentioned, Wade Hampton

20   is one of my ancestors on my mom's side of the family.  You

21   know, I know people say that people who, you know, admire

22   Confederate generals are, you know, admiring traitors,

23   admiring, you know, people that took up arms against our

24   nation.  There's some truth in that, but, you know, my

25   family, they served this nation proudly, Your Honor.  You

1    know, killed in action, POWs, you know, flying -- they've

2    got a lot of medals.  There's a very deep military history

3    in my family, so, you know, when people say that to me,

4    we're as proud of America as there is in this nation, so the

5    way -- I probably view it probably different than the

6    average person.

7              THE COURT:  So the election had to do with

8    preserving Confederate history and honoring --

9              THE DEFENDANT:  No, that's not what the election

10   had to do with, Your Honor, and like I said, I'm sorry --

11             THE COURT:  I don't fault you for your views.  I'm

12   saying -- you're entitled to them.  I just want to know what

13   motivated you to get in the car with a Confederate flag and

14   a knife and a lacrosse stick to go down to the Capitol at

15   3:00 on January 6th --

16             THE DEFENDANT:  I wanted to protest.

17             THE COURT:  -- as opposed to taking your dog out

18   for a walk.

19             THE DEFENDANT:  I wanted to protest.  I had a lot

20   of built-up emotion.

21             THE COURT:  Protest what?

22             THE DEFENDANT:  The removal of history from this

23   nation.

24             THE COURT:  Okay.  And not the election results?

25             THE DEFENDANT:  I had my doubts about the

1    election, but I did -- that wasn't something that I knew for

2    sure, Your Honor.

3                    THE COURT:  Okay.  All right.  Anything else?

4                    THE DEFENDANT:  Yes.  Basically, Your Honor, I

5    wish -- I wish I would have done things differently that

6    evening.  You know, this isn't something that you move on

7    from.  It's going to follow me forever.  A three-second

8    decision to not move back is going to affect me for a

9    lifetime.  I'm a felon now.

10                   You know, I got myself wrapped up in an event that

11   led to, you know, five deaths and four suicides, and that

12   kind of shame sticks with you, and, you know, apologies

13   don't really wipe that out.

14                   So that's about all I have, Your Honor.  Thank

15   you.

16                   THE COURT:  All right.  Very well.  Stay up there.

17                   You know, each one of these cases is different.

18   We have to consider a lot of factors.  Rest assured that I

19   have done that in this case.  It is much more of an art than

20   a science.  We talk about these guideline ranges and the

21   numbers, and sometimes I think that defendants think it's

22   just a matrix or a calculation, when really it's not, right?

23   And I try to get to the bottom of what's going on, who the

24   defendant is, and exactly what they did or did not do.

25                   The starting point always is the guidelines range.

1    I've calculated them at 18 to 24 months because your conduct

2    qualifies as aggravated assault, but as I said at the

3    beginning, you know, I've viewed the video.  It is not the

4    most serious assault of any that I've seen.  I agree with

5    Mr. Roberts about that, and so I think the eight to 12 range

6    is a more accurate starting point in this case.

7            As I said before, I also generally give defendants

8    the benefit of the offense level estimation in the plea

9    agreement.  That's the bargain that you struck, and I think

10   the government is prepared to live by that.

11           Yours is an interesting case because most of the

12   cases I see it's folks who are there earlier who either get

13   into the building or attempt to get into the building, and

14   I'm assessing, you know, what they did, what they didn't do,

15   whether they assaulted anybody, whether they broke anything.

16           Yours is a little different case.  Maybe you got

17   in your car to protest and express your views about your

18   ancestors, or maybe it was because you were a Donald Trump

19   supporter and you wanted to join the folks who were

20   protesting the election.  I don't know, frankly, why you

21   chose to do that, but I do know that you came primed for a

22   fight, right?  You don't come with a knife, you don't put

23   a -- fly a Confederate battle flag in the middle of

24   Washington, D.C., knowing that you might encounter counter

25   protesters or whoever.

1          That's a very provocative thing to do.  So I don't

2    think you were -- you were looking for a fight.  You didn't

3    find it from Antifa or anybody else.

4          Whether you would have gone into the Capitol or

5    have gotten farther if you didn't confront that police line,

6    I can't say.  I suspect that, you know, you didn't go there

7    to go on the lawn.  I think you went there to go to the

8    Capitol.  Whether you would have gotten in or not, who

9    knows?

10          So you didn't encounter any counter protesters.

11   The only folks you encountered are the police, and I think

12   you were provocative.  You confronted them.  You know, I

13   think there are different interpretations as to how you were

14   positioned relative to that police line that was coming

15   forward trying just to do their jobs, but you stood up

16   against them, and you squared off, and you mouthed off, and

17   you cross-checked the guy, right?  And that's an offense,

18   and that's a felony offense.

19          I get it.  Emotions were high.  It was not the

20   most violent assault that I've seen, but you were in the

21   wrong, and I think that you did admit that.  And once you

22   got clocked over the head, you came to your senses, and I

23   think -- you know, I don't lecture defendants, but I think

24   you put it better than anybody could have.  You said, "I was

25   an idiot."  And I think you probably agree with that, all

1    right?

2              This is not about the First Amendment.  You're

3    entitled to your views.  You are entitled to your views

4    about the election, about the Confederacy, about your family

5    legacy.  You're entitled to that, and this has nothing to do

6    with what your views are.  It's only about what you did that

7    day.

8              We also have to consider your history.  And I've

9    read the presentence investigation report.  Probation does a

10   terrific job of giving me an idea of who you are.  I've read

11   your letters.  I appreciate your family for being here

12   today.

13             I've also read some of the mental health

14   information in the medical reports, and I'm not going to go

15   into that on the record.  I don't need to.  It is not an

16   excuse, but I do think it explains some of the reasons why

17   you're standing here today, and I would advise you to really

18   concentrate on focusing on those issues.  And I won't say

19   anything more.

20             I don't see why you have a need for an AR-15.  It

21   may be perfectly legal, or at least up until now it's been

22   perfectly legal, but that, in combination with some of your

23   mental health issues, gives the Court some concern.

24             We've talked about sentencing disparities and how

25   you fit in with other defendants.  Each case is different.

1    I find it very hard to mathematically slot people in based

2    on other defendants, but I do agree with the government that

3    the *Cooke* and *Johnson* cases are at least somewhat analogous,

4    and that you probably fall somewhere in between.

5          As we have discussed, you are a first offender.

6    While that is already reflected in the guidelines range, I

7    do think that that, in combination with your age, is an

8    additional mitigating factor.

9          So with that, pursuant to the Sentencing Reform

10   Act of 1984 and in consideration of the provisions of 18 USC

11   3553 as well as the advisory sentencing guidelines range, it

12   is the judgment that you, David Blair, are hereby committed

13   to the custody of the Bureau of Prisons for a term of five

14   months on Count 2.  You are further sentenced to serve 18

15   months of supervised release on Count 2.  You are also

16   ordered to pay a special assessment of $500 in accordance

17   with 18 USC 3013.

18         While on supervision, you shall abide by the

19   following mandatory conditions as well as the standard

20   conditions of supervision, which are imposed to establish

21   the basic expectations of your conduct while on supervision.

22   These mandatory conditions include you must not commit

23   another federal, state, or local crime.

24         You must not unlawfully possess a controlled

25   substance.  You must refrain from any unlawful use of a

1    controlled substance.  You must submit to one drug test

2    within 15 days of placement on supervision and at least two

3    periodic tests thereafter.

4            You must cooperate in the collection of DNA as

5    directed by your probation officer, and you must make

6    restitution in accordance with 18 USC 3663 or any other

7    statute authorizing a sentence of restitution, and that

8    restitution figure shall be $2,000 as agreed to in your plea

9    agreement.  The Court will not impose any other fine.

10           There will be a financial disclosure provision.

11   You shall provide the probation office with your income tax

12   returns, authorization for release of credit information,

13   and information about any business or finances in which you

14   have a control or interest until all restitution is

15   satisfied.  You are prohibited from incurring new credit

16   charges, opening additional lines of credit, or negotiating

17   or consummating any financial contracts without the approval

18   of the probation office.

19           Ms. Baker, there was not a payment schedule for

20   the restitution.  What would be an appropriate payment

21   schedule here over a course of 24 months of supervised

22   release?

23           THE PROBATION OFFICER:  Your Honor, we have

24   indicated $100 as the payment plan, but we would defer to

25   the Court, if the Court feels that it can be less than that.

1          THE COURT:  The Court will order restitution in

2    the amount of $2,000 payable in $100-per-month installments

3    for a period of 20 months.

4          Mr. Blair, I don't do this for all defendants, but

5    I'm going to include what's called a reentry progress

6    hearing.  So after your release, probably within six months

7    or so, I want you to come back, and we're going to have a

8    conversation just to see how things are going just to make

9    sure that you're on the right track and that -- you know, I

10   didn't mention this, but the Internet communications that

11   the government referenced that may or may not have anti-

12   Semitic issues, you know, I want you to think about just

13   sort of where you are in life, and to the extent that you

14   want to get involved in these conspiracy theories or -- be

15   careful what you read on the Internet and who you

16   communicate with, all right?  And when we meet up, you know,

17   in a number of months, let's talk about that and just how

18   your life's going generally, including some of the mental

19   health stuff, okay?  All right.

20         Okay.  Again, the Court finds that you do not have

21   the ability to pay a fine and therefore waives imposition of

22   a fine in this case.

23         Restitution payments shall be made to the Clerk of

24   the Court of the United States District Court, the District

25   of Columbia, with further disbursement to the Architect of

1      the Capitol.

2              The special assessment is immediately payable to

3      the Clerk of the Court.  Within 30 days of any change of

4      address you shall notify the Clerk of the Court of the

5      change until such a time as your complete financial

6      obligation is paid in full.

7              The probation office shall release the presentence

8      investigation report to all appropriate agencies, including

9      the United States Probation Office in the approved district

10     of residence.

11             You reside in Maryland; is that right?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  Ms. Baker, are we going to transfer

14     supervision to Maryland, or are we going to keep it here?

15             THE PROBATION OFFICER:  Your Honor, we would

16     request to keep it here at this time.  The supervision

17     officer at any point during supervision can make a

18     recommendation to the Court that it be transferred, but we

19     would ask that we would keep it here for now.

20             THE COURT:  Okay.  Both supervision and

21     jurisdiction will be retained in Washington.

22             You have the right to appeal the sentence imposed

23     by the Court if the period of imprisonment is longer than

24     the statutory maximum or the sentence departs upward from

25     the applicable guidelines range.  If you choose to appeal,

1    you must file any appeal within 14 days after the Court

2    enters judgment.

3             You have the right to challenge the conviction

4    entered or the sentence imposed if new and currently

5    unavailable information becomes available to you or on a

6    claim that you received ineffective assistance of counsel in

7    entering a plea of guilty to the offense of conviction or in

8    connection with this sentencing.  If you are unable to

9    afford the cost of an appeal, you may request permission

10   from the Court to file an appeal without cost to you.

11            Any other objections for the record, Counsel?

12            MR. ROBERTS:  No.  I was just wondering if we

13   could have a -- if he could surrender voluntarily.

14            THE COURT:  The Court will order self-surrender.

15            The Bureau of Prisons will designate a placement

16   and will inform counsel of that placement as well as a

17   report date.

18            MR. ROBERTS:  All right.

19            THE COURT:  Mr. Blair, you're obviously an able,

20   intelligent guy.  I've been impressed by your presentation

21   to the Court, your acceptance of responsibility.  It's

22   sometimes hard to tell whether that's genuine or not, but my

23   gut tells me, based on what you said right afterwards and

24   what you told me here today, that it is genuine.

25            You know, we all make mistakes in life.  No one

1    should be judged by the worst mistake that they've made.  I

2    wish you luck, and I look forward to seeing you within 60

3    days of your release.

4           I'm glad to see you've been offered employment

5    when you get out.  I hope that you take it, and you'll be

6    able to tell me how that's going, too, okay?

7           Anything else, Counsel?

8           MR. LIEBMAN:  No, Your Honor.  Thank you.

9           THE COURT:  All right.  Good luck, Mr. Blair.

10   We're adjourned.

11              (Whereupon the hearing was

12               concluded at 11:29 a.m.)

13         **CERTIFICATE OF OFFICIAL COURT REPORTER**

14

15           I, LISA A. MOREIRA, RDR, CRR, do hereby

16   certify that the above and foregoing constitutes a true and

17   accurate transcript of my stenographic notes and is a full,

18   true and complete transcript of the proceedings to the best

19   of my ability.

20       Dated this 25th day of July, 2022.

21

22
                         /s/Lisa A. Moreira, RDR, CRR
23                       Official Court Reporter
                         United States Courthouse
24                       Room 6718
                         333 Constitution Avenue, NW
25                       Washington, DC 20001